Slip Op. 18-92

## UNITED STATES COURT OF INTERNATIONAL TRADE

| | |
|---|---|
| NATURAL RESOURCES DEFENSE COUNCIL, INC., CENTER FOR BIOLOGICAL DIVERSITY, and ANIMAL WELFARE INSTITUTE,<br><br>               Plaintiffs,<br><br>     v.<br><br>WILBUR ROSS, *in his official capacity as Secretary of Commerce*, UNITED STATES DEPARTMENT OF COMMERCE, CHRIS OLIVER, *in his official capacity as Assistant Administrator of the National Marine Fisheries Service*, NATIONAL MARINE FISHERIES SERVICE, STEVEN MNUCHIN, *in his official capacity as Secretary of the Treasury*, UNITED STATES DEPARTMENT OF THE TREASURY, KIRSTJEN NIELSEN, *in her official capacity as Secretary of Homeland Security*, and UNITED STATES DEPARTMENT OF HOMELAND SECURITY,<br><br>               Defendants. | Before: Gary S. Katzmann, Judge<br><br>Court No. 18-00055 |

## OPINION

[Plaintiffs' motion for a preliminary injunction is granted and defendants' motion to dismiss is denied.]

Dated:  July 26, 2018

Giulia C.S. Good Stefani and Daniel N. Carpenter-Gold, Natural Resources Defense Council, of Santa Monica, CA, argued for plaintiffs. With them on the brief were Stephen Zak Smith for plaintiff, Natural Resources Defense Council Inc. and Sarah Uhlemann, of Seattle, WA, for plaintiffs, Center for Biological Diversity, and Animal Welfare Institute.

Agatha Koprowski, Trial Attorney, Commercial Litigation Branch, Civil Division, U.S. Department of Justice, of Washington, DC, argued for defendant. With her on the brief were Chad A. Readler, Acting Assistant Attorney General, Jeanne E. Davidson, Director, and Patricia M.

McCarthy, Assistant Director.  Of counsel on the brief were Jason Forman, National Oceanic and Atmospheric Administration, of Silver Spring, MD; Daniel J. Paisley, Department of the Treasury, of Washington, DC; and Glenn Kaminsky, Department of Homeland Security, of New York, NY.

Katzmann, Judge:  The vaquita, the world's smallest porpoise -- only about five feet long and weighing one hundred pounds -- is a critically endangered marine mammal endemic to the northern Gulf of California, in Mexican waters.  Though the species has existed for millions of years, the population was first surveyed in the late 1990s.  At that time, scientists estimated that there were 567 vaquita in the wild.  The vaquita is now on the brink of extinction.  Only about 15 vaquita remain today, and the population is declining at a rate of almost 50 percent each year.  The status of the species is so precarious that even one mortality could increase the likelihood of extinction.  The vaquita is an evolutionarily distinct animal with no close relatives, and its loss would represent a disproportionate loss of biodiversity, unique evolutionary history, and the potential for future evolution.  The Zoological Society of London has listed the vaquita as a top Evolutionarily Distinct and Globally Endangered species, a list reserved for those species that are especially "unique . . . [and] when they are gone there will be nothing like them left on earth."

It is undisputed that the cause of the vaquita's precipitous decline is its inadvertent tangling, strangulation, and drowning in gillnets, which are fishing nets hung in the water to entangle fish and shrimp.  The Government of Mexico, which regulates fishing practices in the Gulf of California, has banned the usage of gillnets in certain fisheries within the vaquita's range, though illegal gillnet fishing continues.  In other fisheries, gillnet fishing remains legal.  If current levels of gillnet fishing in the vaquita's habitat continue, the species will likely be extinct by 2021.

Hoping to avert exactly this sort of catastrophe, Congress enacted the Marine Mammal Protection Act ("MMPA") of 1972, Pub. L. No. 92-522, 86 Stat. 1027 (codified as amended in scattered sections of 16 U.S.C.).  Invoking the conditional ban on imports of fish and fish products

found in Section 101(a)(2) of the MMPA, 16 U.S.C. § 1371(a)(2) (2012),[1] also known as the

Imports Provision, plaintiffs Natural Resources Defense Council ("NRDC"), Center for Biological

Diversity, and Animal Welfare Institute brought this action in the United States Court of

International Trade.   To prevent the irreparable harm that would result from the extinction of the

vaquita, plaintiffs now move for a preliminary injunction requiring defendants -- several United

States agencies and officials, and here collectively referred to as "the Government" -- to ban the

importation of fish or fish products from any Mexican commercial fishery that uses gillnets within

the vaquita's range.   The Government, though opposing the motion, acknowledges that the vaquita

may soon disappear from the planet forever, and "agree[s] that the primary threat to the vaquita is

gillnet fishing within the vaquita's range."   Def.'s Br. at 2–3.   Upon consideration of the record

and the MMPA, the court grants plaintiffs' motion for a preliminary injunction.

## BACKGROUND

**I.**     <u>**Legal Background**</u>

Congress passed the MMPA in 1972.   In doing so, Congress found that "certain species

and population stocks of marine mammals are, or may be, in danger of extinction or depletion as

a result of man's activities." 16 U.S.C. § 1361(1).   Congress also found that "such species and

population stocks should not be permitted to diminish beyond the point at which they cease to be

a significant functioning element in the ecosystem of which they are a part, and, consistent with

this major objective, they should not be permitted to diminish below their optimum sustainable

population." Id. § 1361(2). Congress noted that "marine mammals have proven themselves to be

resources of great international significance, esthetic and recreational as well as economic," and

---

[1] Subsequent references to sections of the MMPA are to the relevant portions of the official 2012 edition of the United States Code.

found "that they should be protected and encouraged to develop to the greatest extent feasible commensurate with sound policies of resource management." Id. § 1361(6).  Further, whenever consistent with the maintenance of the health and stability of the marine ecosystem, "it should be the goal to obtain an optimum sustainable [marine mammal] population keeping in mind the carrying capacity of the habitat."  Id.  Congress' findings clearly show that "[t]he Act was to be administered for the benefit of the protected species rather than for the benefit of commercial exploitation."  Kokechik Fishermen's Ass'n v. Sec'y of Commerce, 839 F.2d 795, 800 (D.C. Cir. 1988) (quoting Comm. for Humane Legis., Inc. v. Richardson, 540 F.2d 1141, 1148 (D.C. Cir. 1976)).  Primary responsibility for the implementation of the MMPA rests with the National Oceanic and Atmospheric Administration's National Marine Fisheries Service ("NOAA Fisheries"), which is within the Department of Commerce.  See 16 U.S.C. § 1362(12)(A)(i).[2]

The MMPA created a "moratorium on the taking and importation of marine mammals and marine mammal products," with certain exceptions.  16 U.S.C. § 1371(a).  "Congress decided to undertake this decisive action because it was greatly concerned about the maintenance of healthy populations of all species of marine mammals within the ecosystems they inhabit."  Kokechik, 839 F.2d at 801.  In overview, as set forth below, in the MMPA, Congress mandated an "immediate goal that the incidental kill or incidental serious injury of marine mammals permitted in the course of commercial fishing operations be reduced to insignificant levels approaching a zero mortality and serious injury rate." 16 U.S.C. § 1371(a)(2); see also 16 U.S.C. § 1387(b) (stating the "[z]ero

---

[2] The term "Secretary," as used throughout the MMPA, and except where otherwise specified, means "the Secretary of the department in which the National Oceanic and Atmospheric Administration is operating, as to all responsibility, authority, funding, and duties under this chapter with respect to [whales, dolphins, and porpoises] and members, other than walruses, of the order Pinnipedia."  16 U.S.C. § 1362(12)(A)(i).  Currently, that is the Department of Commerce. See 50 C.F.R. § 216.3 ("Secretary shall mean the Secretary of Commerce or his authorized representative.").

mortality rate goal" that "[c]ommercial fisheries shall reduce incidental mortality and serious injury of marine mammals to insignificant levels approaching a zero mortality and serious injury rate within 7 years after April 30, 1994").  To achieve this goal, the MMPA sets specific standards governing and restricting the incidental catch[3] of marine mammals, commonly referred to as "bycatch." 16 U.S.C. §§ 1386–87.

The MMPA standards apply both to domestic commercial fisheries and to foreign fisheries that wish to export their products to the United States.  At issue in this litigation is the Imports Provision, 16 U.S.C. § 1371(a)(2),[4] under which, "[m]arine mammals may be taken incidentally

---

[3] The regulatory definitions pertaining to the MMPA provide that:

> Incidental catch means the taking of a marine mammal (1) because it is directly interfering with commercial fishing operations, or (2) as a consequence of the steps used to secure the fish in connection with commercial fishing operations: <u>Provided,</u> That a marine mammal so taken must immediately be returned to the sea with a minimum of injury and further, that the taking of a marine mammal, which otherwise meets the requirements of this definition shall not be considered an incidental catch of that mammal if it is used subsequently to assist in commercial fishing operations.

50 C.F.R. § 216.3.

[4] The Imports Provision provides in relevant part:

> Marine mammals may be taken incidentally in the course of commercial fishing operations and permits may be issued therefor under section 1374 of this title subject to regulations prescribed by the Secretary in accordance with section 1373 of this title, or in lieu of such permits, authorizations may be granted therefor under section 1387 of this title, subject to regulations prescribed under that section by the Secretary without regard to section 1373 of this title. . . . In any event it shall be the immediate goal that the incidental kill or incidental serious injury of marine mammals permitted in the course of commercial fishing operations be reduced to insignificant levels approaching a zero mortality and serious injury rate. The Secretary of the Treasury shall ban the importation of commercial fish or products from fish which have been caught with commercial fishing technology which results in the incidental kill or incidental serious injury of ocean mammals in excess of United States standards. For purposes of applying the preceding sentence, the Secretary—

in the course of commercial fishing operations" pursuant to permits or authorizations issued under

other MMPA provisions.  Emphasizing the MMPA's overarching purpose, the Imports Provision

states:

> In any event it shall be the immediate goal that the incidental kill or incidental
> serious injury of marine mammals permitted in the course of commercial fishing
> operations be reduced to insignificant levels approaching a zero mortality and
> serious injury rate. The Secretary of the Treasury[5] shall ban the importation of
> commercial fish or products from fish which have been caught with commercial
> fishing technology which results in the incidental kill or incidental serious injury of
> ocean mammals in excess of United States standards.

16 U.S.C. § 1371(a)(2).  Apart from establishing the zero mortality and serious injury standard,

the MMPA does not further define the phrase "United States standards."  See id.  As discussed

below, pp. 33–38, the statute does contain multiple provisions, including those which direct NOAA

Fisheries to make stock assessments, and assess the potential biological removal ("PBR") level,

16 U.S.C. § 1386(a)(6), see below, pp. 33–34, to effectuate "the immediate goal that the incidental

mortality or serious injury of marine mammals occurring in the course of commercial fishing

operations be reduced to insignificant levels approaching a zero mortality and serious injury rate."

16 U.S.C. § 1387(a)(1).  Subsection 1387(g)(1), meanwhile, states that the Secretary of Commerce

---

> (A) shall insist on reasonable proof from the government of any nation from
> which fish or fish products will be exported to the United States of the
> effects on ocean mammals of the commercial fishing technology in use for
> such fish or fish products exported from such nation to the United States[.]

16 U.S.C. § 1371(a)(2).

[5] NOAA Fisheries has interpreted this directive to apply to the Departments of the Treasury and
Homeland Security, in cooperation with NOAA Fisheries.  See Fish and Fish Import Provisions
of the Marine Mammal Protection Act, 81 Fed. Reg. 54,390, 54,394 (Aug. 15, 2016) (if NOAA
Fisheries finds a foreign fishery does not meet MMPA standards, the agency, "in cooperation with
the Secretaries of the Treasury and Homeland Security, will identify and prohibit the importation
of fish and fish products" from the harvesting nation).

"shall" undertake emergency rulemaking actions if he or she "finds that the incidental mortality and serious injury of marine mammals from commercial fisheries is having, or is likely to have, an immediate and significant adverse impact on a stock or species."   Before undertaking emergency rulemaking action, however, "the Secretary shall consult with the Marine Mammal Commission," among other stakeholders.  16 U.S.C. § 1387(g)(2).

The Marine Mammal Commission ("MMC") was established by the MMPA as an independent United States agency.  16 U.S.C. § 1401.  The MMC is directed to "recommend to the Secretary [of Commerce] and to other Federal officials such steps as it deems necessary or desirable for the protection and conservation of marine mammals."  Id. § 1402(a)(4).  In addition, "[a]ny recommendations which are not followed or adopted [by the Secretary of Commerce and other Federal Officials] shall be referred to the Commission together with a detailed explanation of the reasons why those recommendations were not followed or adopted."  Id. § 1402(d).

Plaintiff Center for Biological Diversity first petitioned for implementation of the Imports Provision in 2008.  See Fish and Fish Product Import Provisions of the Marine Mammal Protection Act, 81 Fed. Reg. 54,390, 54,390 (Aug. 15, 2016).  In response, NOAA Fisheries issued an advance notice of proposed rulemaking in 2010, see Implementation of Fish and Fish Product Import Provisions of the Marine Mammal Protection Act, 75 Fed. Reg. 22,731 (Apr. 30, 2010), but did not proceed further.  Four years later, plaintiffs, alleging administrative inaction, brought suit in the United States Court of International Trade.  See Compl., Ctr. for Biological Diversity v. Pritzker, No. 14-157-MAB (July 2, 2014).  As a result of the ensuing settlement, in August 2016, NOAA Fisheries promulgated regulations guiding implementation of the Imports Provision. These regulations are codified at 50 C.F.R. Part 216, and are known here collectively as the

Regulation.  Paragraph (h)(1) of 50 C.F.R. § 216.24 calls for a "comparability finding"[6] to be made

between the regulatory programs regarding fisheries in the United States and those of the foreign

harvesting nation that seeks to import its fish and fish products into the United States.[7]  See 50

C.F.R. §§ 216.24(h)(6)(iii), 216.3.  Paragraph (h)(1) states in relevant part:

> [T]he importation of commercial fish or fish products which have been caught with
> commercial fishing technology which results in the incidental kill or incidental
> serious injury of ocean mammals in excess of U.S. standards or caught in a manner
> which the Secretary has proscribed for persons subject to the jurisdiction of the
> United States are prohibited.  For purposes of paragraph (h) of this section, a fish
> or fish product caught with commercial fishing technology which results in the
> incidental mortality or incidental serious injury of marine mammals in excess of
> U.S. standards is any fish or fish product harvested in an exempt or export fishery
> for which a valid comparability finding is not in effect.

50 C.F.R. § 216.24(h)(1)(i) (emphases added).  Accordingly, paragraph (h)(1) also declares it

"unlawful for any person to import, or attempt to import, into the United States for commercial

purposes any fish or fish product if such fish or fish product: [] Was caught or harvested in a fishery

that does not have a valid comparability finding in effect at the time of import."   Id. §

---

[6] "Comparability finding means a finding by the Assistant Administrator that the harvesting nation
for an export or exempt fishery has met the applicable conditions specified in § 216.24(h)(6)(iii)
subject to the additional considerations for comparability determinations set out in § 216.24(h)(7)."
50 C.F.R. § 216.3.

[7] The Regulation provides:

> For the purposes of paragraph (h) of this section, harvesting nation means the
> country under whose flag or jurisdiction one or more fishing vessels or other entity
> engaged in commercial fishing operations are documented, or which has by formal
> declaration or agreement asserted jurisdiction over one or more authorized or
> certified charter vessels, and from such vessel(s) or entity(ies) fish are caught or
> harvested that are a part of any cargo or shipment of fish or fish products to be
> imported into the United States, regardless of any intervening transshipments,
> exports or re-exports.

50 C.F.R. § 216.24(h)(2)(i)(A).

216.24(h)(1)(ii)(A).  However, "[t]he prohibitions of paragraph (h)(1) of this section do not apply during the exemption period," which is "the one-time, five-year period that commences January 1, 2017."  Id. §§ 216.24(h)(2)(ii), 216.3.  Accordingly, the exemption period will end on January 1, 2022.

In promulgating the Regulation, NOAA Fisheries allowed for "Emergency Rulemaking," stating that, in the case of a "very small" marine mammal population "where any incidental mortality could result in increased risk of extinction," it "may consider emergency rulemaking to ban imports of fish and fish products from an export or exempt fishery having or likely to have an immediate and significant adverse impact on a marine mammal stock."  81 Fed. Reg. at 54,395.

## II.   **Factual Background**

The essential facts are not in dispute.  The vaquita, one of seven species of porpoise worldwide, was listed as an endangered species in 1985.  Endangered Fish or Wildlife; Cochito, 50 Fed. Reg. 1056 (Jan. 9, 1985) (codified at 50 C.F.R. § 17.11).  The vaquita is an evolutionarily distinct animal with no close relatives, whose loss would represent a disproportionate loss of biodiversity, unique evolutionary history, and the potential for future evolution.  Jefferson Decl. ¶ 5, Mar. 19, 2018, ECF No. 14-4.  It has been listed by the Zoological Society of London as a top Evolutionarily Distinct and Globally Endangered species, a list reserved for those species that are especially "unique . . . [and] when they are gone there will be nothing like them left on earth."  Id.  This little porpoise is endemic to the northern Gulf of California, Mexico.  Id. ¶ 6; Pl.'s Amend. Compl. ¶ 35 ("Compl."), Mar. 22, 2018, ECF No. 10.  Its range is approximately 4,000 square kilometers in size, and as relevant to this case, overlaps with commercial fisheries that target shrimp, curvina, chano, and sierra, and with an illegal fishery targeting the endangered totoaba.  Jefferson Decl. ¶ 6; Compl. ¶¶ 35, 43, 51.  Curvina, chano, and sierra fishing occurs year-round in

the northern Gulf of California, while shrimp fishing occurs from September to March. Good

Stefani Decl.[8] Ex. 26, A Comparison of Fishing Activities Between Two Coastal Communities

Within a Biosphere Reserve in the Upper Gulf of California (2015), at 260. Both plaintiffs and

the Government agree that, though the vaquita is not a target of Mexican fishermen, it is threatened

and inadvertently killed by gillnets deployed to capture these other species with which it shares its

territory. The parties also agree that the vaquita is on the verge of extinction as a result.

In 1996, the Mexican government created the Comité Internacional para la Recuperación

de la Vaquita[9] ("CIRVA"), a collection of vaquita scientists which meets regularly to take stock

of the species and make science-based recommendations to support the species' survival. Good

Stefani Decl. Ex. 35, Scientific Reports of the First Three CIRVA Meetings (Jan. 25–26, 1997,

Feb. 7–11, 1999, and Jan. 18–24, 2004), at 1–3; Compl. ¶ 37. CIRVA's findings and

recommendations are published in a meeting report. Compl. ¶ 37. In 1997, a cooperative Mexican-

American survey sampled the entire geographical range of the vaquita and estimated a population

size of 567. Good Decl. Ex. 27, NOAA Fisheries: Vaquita Conservation and Abundance (updated

Aug. 1, 2017), at 1; Compl. ¶ 36. CIRVA, in its eighth meeting report, published in February

2017, estimated that between 2011 and 2016, the vaquita suffered an average annual rate of decline

of 39 percent, "corresponding to a population decline of 90% over this five-year period." Good

Stefani Decl. Ex. 40, CIRVA 8th Meeting Report (Nov. 29–30, 2016), at 3. CIRVA has attributed

this precipitous decline to the vaquita's "mortality in illegal gillnets." Id. The annual decline rate

increased to 49 percent in 2015 and 2016, resulting in a loss of almost half of the then-remaining

---

[8] The Good Stefani Declaration was executed and filed on April 16, 2018, and appears in the court's docket at ECF No. 14–2. The exhibits to the declaration were also filed on April 16 and appear at ECF No. 14–3.

[9] Meaning the "International Committee for the Recovery of the Vaquita."

vaquita population.  Id.  CIRVA estimated that, as of November 2016, approximately 30 vaquita

remained, and that at the current rate of gillnet mortality, the vaquita would be extinct within a few

years.  Id.  In light of these facts, CIRVA repeated "its previous recommendation that the

Government of Mexico implement a permanent ban on all gillnets throughout the entire range of

the vaquita."  Id. at 4.  In its tenth meeting report, published in January 2018, CIRVA stated that

despite Mexico's regulatory efforts, "[h]igh levels of illegal fishing continue," and determined that

"[e]nforcement thus far has failed to prevent illegal fishing and the survival of vaquita depends on

a gillnet-free habitat."  Good Stefani Decl. Ex. 42, CIRVA 10th Meeting Report (Dec. 11–12,

2017), at 1, 11.  A net-removal campaign conducted in 2016 and 2017 found almost 400 illegal

nets, including active curvina, shrimp, and totoaba gillnets, in just the small portion of the vaquita's

habitat that was searched.  Id. at 1, 9–10, 15.

     A gillnet is a wall of netting that fishermen hang vertically in the water column to catch

target species.  Jefferson Decl. ¶ 11.  Gillnets come in various mesh sizes, and fishermen use them

actively or set them with weights and buoys for later retrieval.  Accordingly, gillnets kill species

indiscriminately, except insofar as a given animal would not be of a size that would be caught in

the webbing.  Id. ¶ 12.  In the United States, the use of gillnets is tightly regulated and banned in

many areas.  Oppenheim Decl. ¶¶ 15–17, Mar. 29, 2018, ECF No. 14-6.  The Mexican government

declared a temporary ban on some gillnet use within the vaquita's range in 2015.  Good Stefani

Decl. Exs. 1–2, 2015 Temporary Gillnet Ban and English Translation (Oct. 4, 2015).

     On March 1, 2017, the MMC -- which, as noted, is an independent agency of the United

States tasked with recommending measures to NOAA Fisheries for the preservation of marine

mammals, see 16 U.S.C. §§ 1401, 1402(a)(4) -- submitted a letter to the latter stating that "[t]he

gillnet fisheries of the upper Gulf of California [] continue to cause high levels of bycatch mortality

for the vaquita." Good Stefani Decl. Ex. 30, MMC Mar. 1, 2017 Letter to NOAA Fisheries (Mar.

1, 2017), at 1. The MMC found that "[w]e currently have sufficient information to indicate that

all gillnet fisheries that incidentally catch vaquitas are employing a fishing technology that kills .

. . marine mammals in excess of U.S. standards." Id. at 2.

On June 30, 2017, the Mexican government announced a permanent ban on most gillnet

fishing in the vaquita's habitat, prohibited some night-time vessel activity, established a series of

designated landing sites for boats, and required the use of tracking devices on small fishing boats.

Good Stefani Decl. Exs. 3–4, 2017 Permanent Gillnet Ban and English Translation (June 30,

2017); Good Stefani Decl. Ex. 10, Gov't of Mexico Sept. 21, 2017 Letter to NOAA Fisheries

(Sept. 21, 2017), at 13; Compl. ¶ 46. However, the Mexican government exempted gillnet fishing

of the curvina and sierra from the permanent gillnet ban, and so gillnet fishing for those species

continues. Good Stefani Decl. Ex. 15, CONAPESCA[10] Dec. 6, 2017 Letter to NOAA Fisheries

(Dec. 16, 2017), at 5–8; O'Connell Decl. ¶ 16, Apr. 11, 2018, ECF No. 14-5. Sierra are relatively

high-value fish most commonly harvested with gillnets. O'Connell Decl. ¶ 13. Fishing for sierra

within the vaquita's range is well documented, and vaquita have been killed in sierra nets. Good

Stefani Decl. Ex. 22, Vaquita Bycatch in Mexico's Artisanal Gillnet Fisheries (Aug. 2000), at

1111. All curvina fisherman in the northern Gulf of California use gillnets. O'Connell Decl. ¶ 13.

The Mexican government banned fishing for the endangered totoaba, regardless of equipment, in

1975. Gov't of Mexico Sept. 21, 2017 Letter to NOAA Fisheries, at 2. Notwithstanding this ban,

because of high demand for the fish's swim bladder on the Chinese black market, poachers

continue to illegally hunt for the fish, often with gillnets. CIRVA 10th Meeting Report, at 9–10.

---

[10] CONAPESCA is the Comisión Nacional de Acuacultura y Pesca, meaning the National Commission of Aquaculture and Fishing. It is the Mexican agency charged with enforcing the gillnet bans.

Enforcement of the total ban on totoaba fishing is complicated by the fact that the totoaba fishing season overlaps spatially with legal curvina fishing, which, as noted, permits the usage of gillnets. Good Stefani Decl. Ex. 17, NOAA Fisheries Feb. 15, 2018 Letter to CONAPESCA (Feb. 15, 2018), at 11, 13; Ragen Decl. ¶ 27, Mar. 19, 2018, ECF No. 14-7. The curvina and totoaba fisheries both peak in their levels of activity in March and April. O'Connell Decl. ¶ 29; Ragen Decl. ¶ 27.

Pursuant to the permanent ban on gillnet fishing of species other than the curvina and sierra, fishing for shrimp and chano with gillnets inside the vaquita's range is illegal, but continues anyway. CIRVA 10th Meeting Report, at 9–10, 15 (noting availability of gillnet-caught shrimp and gear sweeps finding active shrimp gillnets). Chano fishing continues year-round, with peak season in April and May, and almost half of all chano fishermen illegally use gillnets. O'Connell Decl. ¶¶ 13, 29. Similarly, many shrimp fishermen in the northern Gulf of California illegally continue to use fine-mesh gillnets that are weighted at the bottom, which drags the gillnet low in the water column and increases shrimp yield. Jefferson Decl. ¶ 14; see O'Connell Decl. ¶ 13.

On September 21, 2017, the MMC submitted a second letter to NOAA Fisheries formally recommending that the latter "act immediately to invoke the emergency rulemaking provisions of the MMPA import rule to ban the import into the United States of all fish and fish products from fisheries that kill or seriously injure, or that have the potential to kill or seriously injure vaquitas." Good Stefani Decl. Ex. 31, MMC Sept. 21, 2017 Letter to NOAA Fisheries (Sept. 21, 2017), at 3. The MMC noted that "[n]umerous fisheries in the upper Gulf of California that involve the use of gillnets, regardless of the target species, could contribute to mortality of vaquitas." Id. Further, the MMC referenced the emergency rulemaking provisions found in 16 U.S.C. § 1387(g) of the MMPA, and recommended that NOAA Fisheries "use emergency rulemaking procedures to impose an immediate import ban on those fish or fish products." Id. While NOAA Fisheries has

responded to the issues raised in the MMC's letters through ongoing interagency discussions in

interagency consultations, no action has occurred as a result.  Rauch Decl. ¶ 7, Apr. 19, 2018, ECF

No. 15-1.

### III.   **Procedural History**

Plaintiffs, all environmental nongovernmental organizations, brought this case on March

21, 2018, seeking an injunction requiring the Government to ban the import of fish or fish products

from any Mexican commercial fishery that uses gillnets within the vaquita's range.[11]   Orig.

Compl., ECF No. 1; Summ., ECF No. 2; Compl. at 19.  Plaintiffs named as defendants several

---

[11] In their first claim for relief, plaintiffs allege that the Government failed to ban fish and fish-product imports from northern Gulf of California Mexican commercial fisheries that use gillnets within the vaquita's range.  In their second claim for relief, plaintiffs allege that the Government unlawfully withheld and unreasonably delayed a demand for reasonable proof of the effect on the vaquita of northern Gulf of California Mexican commercial gillnet fishing for export to the United States.  Plaintiffs' request for relief reads as follows:

WHEREFORE, Plaintiffs respectfully request that this Court:

1. Declare that Defendants unlawfully withheld and unreasonably delayed the banning of fish and fish-product imports from northern Gulf of California Mexican commercial fisheries that use gillnets within the vaquita's range;

2. Declare that Defendants unlawfully withheld and unreasonably delayed a demand for reasonable proof of the effect on the vaquita of northern Gulf of California Mexican commercial gillnet fishing for export to the United States;

3. Enter an injunction requiring Defendants to ban the import of fish or fish products from any Mexican commercial fishery that uses gillnets within the vaquita's range;

4. Enter an injunction requiring Defendants to insist on reasonable proof from the Mexican government of the effects of the use of gillnets by northern Gulf of California fisheries on vaquita and that they meet U.S. standards;

5. Award Plaintiffs the costs of this action, including reasonable attorneys' fees; and

6. Grant any other relief this Court finds just and proper.
Compl. at 19–20.

United States agencies and officials charged with enforcing the MMPA.  On April 16, 2018,

plaintiffs filed a motion for a preliminary injunction and supporting memorandum of law.  Mot.

for Prelim. Inj. & Suppl. Mem. of Law (Pl.'s Br."), ECF No. 14.  Plaintiffs also attached the

declarations of several members of their organizations to their motion.  Brit Rosso, a member of

NRDC and the Center for Biological Diversity, regularly travels in the northern Gulf of California

looking for vaquita and other wildlife and has plans to travel to the area to do so again in January

or February 2019.  Rosso Decl. ¶¶ 5–9, Mar. 13, 2018, ECF No. 14-12.  Brett Hartl, a Center for

Biological Diversity member, lives four hours away from the northern Gulf of California and has

regularly traveled there to observe wildlife and to look for the vaquita.  Hartl Decl. at ¶¶ 4, 7, 12,

Feb. 16, 2018, ECF No. 14-10.  Alejandro Olivera Bonilla, a Center for Biological Diversity

member who lives on the Gulf of California, is involved with vaquita conservation work in the

United States and Mexico and frequently visits its habitat.  Olivera Decl. ¶¶ 3, 6–11, 13, Mar. 5,

2018, ECF No. 14-11.  Courtney Vail, an Animal Welfare Institute member who lives five hours

from the northern Gulf of California, works in marine conservation and regularly visits the

northern Gulf of California to visit the vaquita.  Vail Decl. ¶¶ 2, 5–9, Mar. 18, 2018, ECF No. 14-

14.  Plaintiffs argue that the Imports Provision of the MMPA, 16 U.S.C. § 1371(a)(2), imbues the

selected agencies and officials with a duty to embargo imports of fish and shrimp from gillnet

fisheries in the northern Gulf of California.  Pl.'s Br. at 1–2.  Asserting the right of action found in

the Administrative Procedure Act ("APA"), 5 U.S.C. § 706(1), plaintiffs ask this court to "compel

agency action unlawfully withheld or unreasonably delayed," here, the embargo.  Id. at 18, 25–26.

    The Government responded to plaintiffs' motion, and moved to dismiss this case, on May

7, 2018.  Def.'s Resp. in Opp'n and Mot. to Dismiss ("Def.'s Br."), ECF No. 15.  Plaintiffs filed

their reply in support of the motion for a preliminary injunction, and their response in opposition

to the Government's motion to dismiss, on June 11.  Resp. in Opp'n to Def.'s Mot. to Dismiss and

Reply in Supp. of Pl.'s Mot. for Prelim. Inj. ("Pl.'s Reply"), ECF No. 21.  The Government filed

its reply in support of its motion to dismiss on July 2.  Def.'s Reply in Supp. of Mot. to Dismiss

("Def.'s Reply"), ECF No. 22.  Oral argument was held before the court on July 10, 2018.  ECF

No. 24.

## DISCUSSION

The Government argues that plaintiffs' action should be dismissed for two reasons:  (1)

this court lacks subject matter jurisdiction over the Government's failure to impose an import ban

on all fish and fish products from Mexican commercial fisheries that use gillnets within the

vaquita's range, and (2) plaintiffs lack standing.  In the alternative, the Government urges that the

court deny the motion for a preliminary injunction that would enjoin it to immediately impose the

ban.  Plaintiffs oppose the Government's motion to dismiss, and further argue that they are entitled

to the preliminary injunction.  The court concludes that the court does have subject matter

jurisdiction, that plaintiffs have established standing, and that a preliminary injunction is

warranted.  Below, the court discusses each issue in turn.

## I.      This Court Has Subject Matter Jurisdiction.

Plaintiffs must establish subject matter jurisdiction by a preponderance of the evidence.

Reynolds v. Army & Air Force Exch. Serv., 846 F.2d 746, 748 (Fed. Cir. 1988).  When "a motion

to dismiss for lack of subject matter jurisdiction . . . challenges the truth of the jurisdictional facts

alleged in the complaint, the [] court may consider relevant evidence in order to resolve the factual

dispute."  Id. at 747.  Preponderance of the evidence "means the greater weight of evidence,

evidence which is more convincing than the evidence which is offered in opposition to it," Hale v.

Dep't of Transp., F.A.A., 772 F.2d 882, 885 (Fed. Cir. 1985); that is, plaintiffs must demonstrate

that their allegations are "<u>more likely</u> than not" to be true.  <u>Tellabs, Inc. v. Makor Issues & Rights,</u>

<u>Ltd.</u>, 551 U.S. 308, 329 (2007) (emphasis in original).  Even when a motion to dismiss challenges

some jurisdictional facts alleged in the complaint, the Court still must "accept[] as true" any

"uncontroverted factual allegations in the complaint."  <u>Engage Learning, Inc. v. Salazar</u>, 660 F.3d

1346, 1355 (Fed. Cir. 2011); <u>see</u> <u>Gibbs v. Buck</u>, 307 U.S. 66, 72 (1939) (stating that facts "left

unchallenged [are] for the court to accept as true without further proof").

        This Court has exclusive jurisdiction over any civil action arising out of any law of the

United States providing for "embargoes or other quantitative restrictions on the importation of

merchandise for reasons other than the protection of the public health or safety," such as those

prescribed by the MMPA.  28 U.S.C. ¶ 1581(i)(3); <u>see also</u> <u>Earth Island Institute v. Brown</u>, 28

F.3d 76, 79 (9th Cir. 1994) ("[Plaintiffs'] suit under the MMPA is an action arising under a law

providing for embargoes.  As such, it is reserved to the exclusive jurisdiction of the CIT.").  The

APA provides individuals like plaintiff organizations and their members a private right of action

to challenge agency actions or inactions and gives courts the ability to provide relief such as an

injunction.  5 U.S.C. §§ 702, 706(1).  A "claim under § 706(1) can proceed . . . where a plaintiff

asserts that an agency failed to take a discrete agency action that it is required to take."  <u>Norton v.</u>

<u>S. Utah Wilderness Alliance</u>, 542 U.S. 55, 64 (2004) (emphasis omitted).  For the purposes of

obtaining relief pursuant to the APA, an "agency action" is defined as "the whole or a part of an

agency rule, order, license, sanction, relief, or the equivalent or denial thereof, or failure to act."

5 U.S.C. § 551(13).  In short, the APA empowers reviewing courts to "compel agency action

unlawfully withheld or unreasonably delayed."  5 U.S.C. § 706(1).

        Plaintiffs contend that the Imports Provision imposes on the Government a mandatory,

discrete, immediate, and continuous duty to ban imports of foreign fish and fish products, if those

fish were caught with gear that "results in the incidental kill" of marine mammals exceeding United

States standards.  16 U.S.C. § 1371(a)(2).  Consequently, they claim that pursuant to the APA, this

court has subject matter jurisdiction and should order the requested preliminary injunction.  The

Government counters that this court does not have subject matter jurisdiction because the agency

action requested by plaintiffs is neither mandatory nor discrete under the MMPA, and thus the

court lacks the authority to issue an import ban.  Def.'s Br. at 13–17.  More specifically, the

Government contends that the Regulation provides a five-year exemption for foreign fisheries and

their governments and that several steps and a lengthy process are required in order to make a

comparability finding necessary to impose the ban.  Id.  The Government's arguments are not

persuasive.

        The import ban requested here is both discrete and mandatory for purposes of the APA.

The parties at oral argument agreed that the Imports Provision imbues the Government with a duty

to ban importation of commercial fish and fish products where the commercial fishing technology

results in the incidental kill of marine mammals.  Oral Arg.; see 16 U.S.C. § 1371(a)(2) (providing

that the Government "shall ban the importation of commercial fish or products from fish which

have been caught with commercial fishing technology which results in the incidental kill or

incidental serious injury of ocean mammals in excess of United States standards").  "Shall" is

mandatory language, demonstrating that Congress left the Government with no discretion whether

to act.  See Murphy v. Smith, 138 S. Ct. 784, 787 (2018) ("[T]he word 'shall' usually creates a

mandate, not a liberty."); Earth Island Inst. v. Mosbacher, 746 F. Supp. 964, 975–76 (N.D. Cal.

1990) (holding embargo of yellowfin tuna was "required by the MMPA, in carrying out Congress'

will in protecting the marine mammals," despite government contention that it needed several

months to compile and analyze data), aff'd, Earth Island Inst. v. Mosbacher, 929 F.2d 1449 (9th

Cir. 1991).  That conclusion is buttressed by the use of "may" elsewhere in the MMPA.  See

Kingdomware Tech., Inc. v. United States, 136 S. Ct. 1969, 1977 (2016) ("When a statute

distinguishes between 'may' and 'shall,' it is generally clear that 'shall' imposes a mandatory

duty."); Anglers Conservation Network v. Pritzker, 809 F.3d 664, 671 (D.C. Cir. 2016) ("[W]hen

a statutory provision uses both 'shall' and 'may,' it is a fair inference that the writers intended the

ordinary distinction.").  Furthermore, it is of note that the MMPA gives the Government discretion

to waive the requirements of other provisions but does not do so for the Imports Provision, which

supports the conclusion that imposition of the import ban is mandatory.  See 16 U.S.C. § 1371(a)(3)

(permitting the Secretary of Commerce to waive requirements relating to the intentional taking or

importing of marine mammals, but not the ban on imports of foreign fish or fish products); Keene

Corp. v. United States, 508 U.S. 200, 208 (1993) ("[W]here Congress includes particular language

in one section of a statute but omits it in another . . . it is generally presumed that Congress acts

intentionally and purposely in the disparate inclusion or exclusion." (alteration in original) (citation

omitted)).  Here, evidence shows that vaquita are killed by gillnet fishing and are on the verge of

extinction: because the statutory duty to ban fish imports resulting in such excessive marine

mammal bycatch is mandatory, the Government must comply with it.

The parties disagree over when the duty to impose an import ban activates, largely based

on disputes regarding the meaning of the phrase "United States standards," and whether NOAA

Fisheries must first make a regulatory determination, pursuant to the Regulation, that those

standards have been exceeded.  It is worth noting that agency regulations cannot negate mandatory

language in a statute: "Congress did not set agencies free to disregard legislative direction in the

statutory scheme that the agency administers.  Congress may limit an agency's exercise of

enforcement power if it wishes, either by setting substantive priorities, or by otherwise

circumscribing an agency's power to discriminate among issues or cases it will pursue." <u>Heckler</u>

<u>v. Chaney</u>, 470 U.S. 821, 833 (1985).  The Government cannot give itself a five year exemption

from compliance with the MMPA, which dictates that the Secretary of the Treasury "shall ban"

offending imports in order to meet the "immediate goal that the incidental kill or incidental serious

injury of marine mammals permitted in the course of commercial fishing operations be reduced to

insignificant levels approaching a zero mortality and serious injury rate."  16 U.S.C. § 1371(a)(2).

By its terms, the Regulation only exempts the foreign fisheries and their governments from the

Regulation, and not the statute, for five years, and thus is not on its face inconsistent with the

MMPA.  <u>See</u> 50 C.F.R. § 216.24(h)(2)(ii) ("The prohibitions of paragraph (h)(1) <u>of this section</u>

shall not apply during the exemption period." (emphasis added)).

The agency action in question is also discrete: plaintiffs here demand the application of a

single provision to a specific factual circumstance that could take the form of a rule or order, as

distinguished from an impermissible broad programmatic attack on the Government's overall

implementation of the MMPA or a general challenge to compliance with a statutory mandate.  <u>See</u>

<u>Norton</u>, 542 U.S. at 62, 66–67 (contrasting "circumscribed, discrete agency actions," including

"agency rule, order, license, sanction [or] relief," with "compliance with a broad statutory

mandate" (quoting 5 U.S.C. § 551(13)));  <u>S. Shrimp All. v. United States</u>, 33 CIT 560, 588, 617 F.

Supp. 2d 1334, 1360–61 (2009) (challenging the efficacy of a program already in place); <u>Vill. of</u>

<u>Bald Head Island v. U.S. Army Corps of Eng'rs</u>, 714 F.3d 186, 193–94 (4th Cir. 2013) (challenging

defendant's nonperformance of vague promise to "protect and nourish its beaches" during 10-year-

long implementation of program).  Although, as discussed above, the Regulation does not apply

here, in any event it does not and cannot transmute the discrete action of issuing an import ban

into something else.  Nowhere does the APA or case law require a discrete action to be comprised

of only one step; indeed, issuing a rule often entails multiple steps.  For an agency action to be

discrete, Congress must "ha[ve] indicated an intent to circumscribe agency enforcement discretion,

and ha[ve] provided meaningful standards for defining the limits of that discretion."  Chaney, 470

U.S. at 834.  It has done so here, dictating that "[t]he Secretary of the Treasury shall ban the

importation of commercial fish or products from fish which have been caught with commercial

fishing technology which results in the incidental kill or incidental serious injury of ocean

mammals in excess of United States standards."  16 U.S.C. § 1371(a)(2).  As this court has noted

above, in the sentence preceding this directive, Congress gave content to the concept of "in excess

of United States standards" when it provided in the statute that "it shall be the immediate goal that

the incidental kill or incidental serious injury of marine mammals permitted in the course of

commercial fishing operations be reduced to insignificant levels approaching a zero mortality and

serious injury rate."  Id.

        In the face of this "zero mortality and serious injury rate" language -- which can be applied

clearly to the vaquita, a species on the brink of extinction because of commercial gillnet fishing

-- the Government continues to argue that the phrase "United States standards" is not defined in

the statute, is ambiguous, and does not clearly give direction to the agency as required to compel

agency action.  It points to the Regulation, which it interprets to require that the agencies must

define United States standards and determine whether they are met in order to impose a ban under

that Regulation.  Hence, the Government argues that the action here is not discrete.  As an initial

matter, as discussed above, the Regulation, which by its own terms becomes effective at the earliest

in January 2022, does not apply here.  More fundamentally, the Government's interpretation

inverts the requirements of the statutory Imports Provision, 16 U.S.C. § 1371(a)(2), because even

assuming arguendo ambiguity in the phrase "United States standards," that term only affects the

Secretary's ability to exempt fisheries from the ban and consequently does not impede this court's subject matter jurisdiction. See 16 U.S.C. § 1371(a)(2); Kokechik, 839 F.2d at 799 ("[A]lthough the Federation actively seeks to catch only salmon, marine mammals protected by the MMPA end up as unintentional victims of salmon gillnet fishing because of the nature of the fishing gear and techniques used. This result is absolutely prohibited by the MMPA unless, pursuant to the requirements of the Act, the Secretary of Commerce specifically grants permission for the taking of marine mammals incidental to commercial fishing." (citing 16 U.S.C. § 1371(a)(2))).

The Government also argues that "the agency [must] engage in discussions with a foreign government and provid[e] an opportunity for that government to provide evidence before making a determination of whether United States standards have been exceeded," Def.'s Reply at 18, in order to comply with the statutory requirement that NOAA Fisheries "shall insist on reasonable proof from the government of any nation from which fish or fish products will be exported to the United States of the effects on ocean mammals of the commercial fishing technology in use for such fish or fish products exported from such nation to the United States." 16 U.S.C. § 1371(a)(2)(A). This argument is unpersuasive. For one thing, the Government has already made the statutorily mandated request and provided Mexico with the opportunity to offer evidence.[12] For another, the Government's position again gets the requirements of the statute backwards: the statute only requires that the Government request information from foreign governments when determining whether to exempt fishery operations from a potential ban arising from bycatch in

---

[12] Although plaintiffs initially asked in their second claim for relief that this court require the Government to request reasonable proof from the Mexican government, Compl. at 19, ¶¶ 60–65, both parties now agree that the Government has already done so, and plaintiffs do not oppose the Government's motion to dismiss that claim as moot. See Def.'s Br. at 17; Rauch Decl. ¶ 5; Pl.'s Reply at 26–27. Accordingly, the court dismisses plaintiffs' second claim as moot.

excess of United States standards.[13]   In this case, it is undisputed that because of bycatch in the

gillnet fishing technology, the vaquita is being killed and is on the verge of extinction -- a result

which perforce contravenes United States standards.   Countenancing a regulations-imposed delay

until 2022 for consultations with the Mexican government (a posture endorsed by the Government,

Def.'s Reply at 18–19), while the vaquita goes extinct, would be inconsistent with the MMPA's

general moratorium on marine mammal takings and the Imports Provision's direction that the

Secretary of the Treasury "shall ban" offending imports in order to meet the "immediate goal that

the incidental kill or incidental serious injury of marine mammals permitted in the course of

commercial fishing operations be reduced to insignificant levels approaching a zero mortality and

serious injury rate."   16 U.S.C. § 1371(a)(2).

## II.   <u>Plaintiffs Have Standing.</u>

The Government contends that plaintiffs lack standing because they have not demonstrated

that they have a particularized injury which is traceable to the Government's nonaction or

redressable through an import ban.   Specifically, it alleges that plaintiffs have never seen vaquita,

that no members have concrete and specific plans to view the vaquita in a timeframe affected by

---

[13] The legislative history of the MMPA further supports a conclusion that the import ban element of the Imports Provision functions as a limited exception to the absolute moratorium effected by 16 U.S.C. § 1371(a), allowing importation of fish and fish products harvested with commercial fishing technology which incidentally kills marine mammals only upon administrative review of information submitted by foreign governments for adherence to United States standards.  <u>See</u> S. Rep. No. 92-863, at 10 (1972) (finding that "unilateral action by the United States . . . could be fruitless unless other nations involved in the taking of marine mammals work with the United States to preserve and protect these creatures"); H.R. Rep. No. 100-970 (Sept. 23, 1988), <u>reprinted in</u> 1988 U.S.C.C.A.N. 6154, 6155 ("The Act required the Secretary of Commerce to obtain reasonable proof from foreign governments <u>in order to make a finding that foreign commercial fishing techniques were not resulting in kills or injuries in excess of U.S. standards.</u>" (emphasis added)); <u>see also</u> 16 U.S.C. § 1371(a)(2)(A).

next fishing season, and that the Mexican government's and individual fishermen's comportment

is responsible for the vaquita's decline rather than the Government's inaction.

"The essence of the standing question, in its constitutional dimension, is whether the

plaintiff has alleged such a personal stake in the outcome of the controversy (as) to warrant his

invocation of federal-court jurisdiction and to justify exercise of the court's remedial powers on

his behalf." Vill. of Arlington Heights v. Metro. Hous. Dev. Corp., 429 U.S. 252, 260–61 (1977)

(internal citations and quotations omitted). Specifically, a plaintiff must show: (1) "that it has

suffered a concrete and particularized injury that is either actual or imminent," (2) "that the injury

is fairly traceable to the defendant," and (3) "that it is likely that a favorable decision will redress

that injury." Massachusetts v. EPA, 549 U.S. 497, 517 (2007) (citing Lujan v. Defs. Of Wildlife,

504 U.S. 555, 560–61 (1992)). The injury may be indirect so long as it is fairly traceable to

defendants' conduct. Vill. of Arlington Heights, 429 U.S. at 261. When "a plaintiff's asserted

injury arises from the government's allegedly unlawful regulation (or lack of regulation) of

someone else" other than the plaintiff, and causation and redressability hinge on the response of a

third party, a plaintiff must show that the third party is likely to respond to the government's

conduct in a way that causes the plaintiff's injury to be redressed. Lujan, 504 U.S. at 561–62

(emphasis in original). Plaintiffs bear the burden of establishing standing, and "[a]t the pleading

stage, general factual allegations of injury resulting from the defendant's conduct may suffice, for

on a motion to dismiss we presum[e] that general allegations embrace those specific facts that are

necessary to support the claim." Id. at 561 (alteration in original) (internal quotations and citation

omitted).

*A.  Plaintiffs Have a Concrete and Particularized Injury that Is Actual or Imminent.*

Plaintiffs have demonstrated that their members have a recreational and aesthetic interest in viewing the vaquita that is harmed by the continual decrease in its population and its potential extinction.  Several of plaintiffs' members have visited the vaquita's habitat -- some multiple times -- to try to observe the porpoise, and at least one member has specific plans to return in the near future.  Rosso Decl. ¶¶ 5–10; Hartl Decl. ¶¶ 7–8, 10; Olivera Decl. ¶¶ 8–13; Vail Decl. ¶ 9.  Further, experts and advisory organizations agree that the ongoing gillnet fishing threatens the vaquita's existence.  See, e.g., CIRVA 10th Meeting Report, at 1 (finding that "the vaquita will be extinct in a few years" absent elimination of human caused mortality); Good Stefani Decl. Ex. 41, CIRVA 9th Meeting Report (Apr. 25–26, 2017), at 4; Jefferson Decl. ¶¶ 11, 15.  As "a person who observes or works with animals of a particular species in the very area of the world where that species is threatened by a federal decision is facing such harm [for purposes of standing], since some animals that might have been the subject of his interest will no longer exist," plaintiffs have established injury.  See Lujan, 504 U.S. at 566–67 (citing Japan Whaling Ass'n v. Am. Cetacean Soc'y, 478 U.S. 221, 230 n.4 (1986)).

The Government posits several reasons why plaintiffs have not sufficiently established injury, such as: plaintiffs have never actually seen a vaquita on their trips; that any lessening of their esthetic or recreational enjoyment is merely "subjective" rather than "objective"; the only relevant fishing season has passed before any plaintiff members plan to returned; and three of the plaintiff members have no specific plans to visit the vaquita habitat again in the future.  All of these arguments are unavailing.

First, for purposes of the injury determination, it does not matter whether any of the plaintiff members have managed to view a vaquita yet, as "the <u>desire</u> to use or observe an animal

species, even for purely esthetic purposes, is undeniably a cognizable interest for purpose of

standing." Lujan at 562–63 (emphasis added); see also Japan Whaling Ass'n, 478 U.S. at 230 n.4

(holding that the fact that "the whale watching and studying of [whale conservation groups']

members will be adversely affected by continued whale harvesting" by Japan absent U.S. sanctions

was sufficient injury for standing purposes).   Second, the Government has provided no authority

for the distinction it drew at oral argument between "subjective" and "objective" harms to

recreational and esthetic enjoyment.   Third, plaintiffs have provided evidence that, although gillnet

fishing activities peak in particular months, gillnet fisheries operate throughout the year and that

gillnet fishing causes vaquita deaths in the months leading up to Rosso's visit.   A Comparison of

Fishing Activities, at 260 (showing that curvina, sierra, and chano fisheries in the Gulf of

California operate year-round and the shrimp fishery operates September through March); Good

Stefani Suppl. Decl. Ex. 1, Action Program for the Conservation of the Species: Vaquita (Feb.

2008), at 20, ECF No. 21-1 (documenting vaquita bycatch from December through May).   Finally,

at least one plaintiff member -- Rosso -- has specific plans to visit the vaquita's habitat to try to

observe the porpoise in the future.   Rosso Decl. ¶ 10 (stating plans to return in "January or

February" of 2019); see Friends of the Earth, Inc. v. Laidlaw Envtl. Servs., 528 U.S. 167, 181

(2000) ("An association has standing to bring suit on behalf of its members when its members

would otherwise have standing to sue in their own right, the interests at stake are germane to the

organization's purpose, and neither the claim asserted nor the relief requested requires the

participation of individual members in the lawsuit." (citing Hunt v. Washington State Apple

Adver. Comm'n, 432 U.S. 333, 343 (1977))).   Harm to one plaintiff member is enough to establish

injury for purposes of standing.   See Vill. of Arlington Heights, 429 U.S. at 264 & n.9; Animal

Welfare Inst. v. Kreps, 561 F.2d 1002, 1008 (D.C. Cir. 1977) ("[I]t is well settled that standing

does not depend on the size or quantum of harm to the party.").  Plaintiffs have thus established

that their injury is concrete, particularized, and actual or imminent.

The Government also argues that, at the very least, the Animal Welfare Institute has not

established injury because Rosso, the only declarant with specific future plans to visit the vaquita's

habitat, is not a member of the Animal Welfare Institute.  See Rosso Decl. ¶ 2 (stating that he is a

member of the NRDC and Center for Biological Diversity).  However, each of the three other

members had specific plans to visit the vaquita habitat at the time the case was filed, see Hartl

Decl. ¶ 10 ("plans to return to the Upper Gulf in late March of 2018 to try . . . to view the vaquita");

Olivera Decl. ¶ 13 ("specific plans" to return "late this March [2018]"); Vail Decl. ¶ 9 ("specific

plans to travel to Puerto Penasco in April [2018]"), and the "jurisdiction of the Court depends upon

the state of things at the time of the action brought."  Keene Corp. v. United States, 508 U.S. 200,

207 (1993) (quoting Mollan v. Torrance, 22 U.S. (9 Wheat.) 537, 539 (1824) (Marshall, C.J.)); see

Lujan, 504 U.S. at 569 n.4 ("The existence of federal jurisdiction ordinarily depends on the facts

as they exist when the complaint is filed." (emphasis added by Lujan court) (quoting Newman–

Green, Inc. v. Alfonzo–Larrain, 490 U.S. 826, 830 (1989))); see also Cleveland Branch,

N.A.A.C.P. v. City of Parma, OH, 263 F.3d 513, 524–26 (6th Cir. 2001) (summarizing cases where

the Supreme Court and Circuit Courts applied this principle).  Thus, the Animal Welfare Institute

has established injury as well.

> B.  *Plaintiffs' Injury Is Fairly Traceable to the Government's Inaction and Redressable by an Import Ban.*

The Government contends that plaintiffs' injury is not fairly traceable to the Government's

inaction because the conduct of third parties -- the Mexican government and Mexican fisheries --

is the cause of the vaquita's decline and any resulting harm to plaintiffs' recreational and esthetic

interests in the vaquita.  In light of the various actions these third parties could undertake in

response to an import ban -- such as pursuing a World Trade Organization case against the United

States, retaliating with trade sanctions of their own, or resorting to the lucrative and illicit totoaba

fishery in response to tighter regulation of legal fisheries -- the Government argues that plaintiffs

have failed to demonstrate that an import ban would help save the vaquita and thus ameliorate

harm to plaintiffs' recreational and esthetic interests.  The Government also contends that, even if

Mexico responds by banning gillnet use in all its fisheries, causation and redressability are not

established because many vaquita deaths result from gillnets used in the already illegal totoaba

fishing.

These arguments lack merit.  Plaintiffs have shown that the third parties in question are

likely to respond to a United States import ban in a way that reduces danger to the vaquita and

consequently harm to plaintiffs' recreational and esthetic interests.  First, plaintiffs have provided

persuasive evidence demonstrating that the United States is a significant export market for the

gillnet fisheries in question.  O'Connell Decl. ¶¶ 25–28 (indicating that substantial amounts of

curvina, sierra, shrimp, and chano are exported from Mexico to the United States); Good Stefani

Decl. Ex. 28, Estimates of Illegal and Unreported Fish in Seafood Imports to the USA (Apr. 2014),

at 105, 112 (finding in a study that the United States market "is one of the world's biggest seafood

markets, whose purchasing power has a significant impact on patterns of fishing and trade" and

that Mexico was one of the top ten exporters of studied wild-caught fisheries products to the United

States); Good Stefani Decl. Ex. 39, CIRVA 7th Meeting Report (Nov. 29–30, 2016), at 25 (finding

in a study that wild shrimp from the region "is one of the most important fisheries in Mexico" and

has one of the highest values, employment numbers, and ships of Mexican fisheries); Pl.'s Br. Ex.

4, Fisheries in Mexico's Upper Gulf of California (June 2009), at 13, ECF No. 14-1 (finding in

United States government report that "[a]bout 80% of Mexico's fish exports end up in the US").[14]

Second, plaintiffs have demonstrated that Mexico has responded to past import bans

imposed under similar circumstances by enacting and enforcing new environmental regulations,

and that the Mexican government has actively negotiated in opposition to a potential embargo in

this case, which shows that the Mexican government is concerned with preserving access to the

United States market for its fisheries.  O'Connell Decl. ¶¶ 44–54; Rauch Decl. ¶¶ 3–5 (describing

negotiations); Good Stefani Decl. Exs. 8–18 (exhibiting communications between Mexican and

United States governments regarding vaquita protection); see also Kreps, 561 F.2d at 1009 (citing

the "extensive negotiations" undertaken by the South African government in response to a

potential embargo as evidence of traceability).  For example, a 1986 report suggests that Mexico

made notable efforts to protect dolphins in response to a tuna embargo, Pl.'s Br. Ex. 5, Annual

Report of the Inter-American Tropical Tuna Commission, 1985 (1986), at 52–53, ECF No. 14-1,

and an attachment to the 1995 Panama Declaration explicitly discussed lifting an embargo of

Mexican tuna products in exchange for better protections for dolphins.  O'Connell Decl. Ex. 6,

Declaration of Panama (Oct. 4, 1995), at 5.  The Government's own report noted that dolphin

deaths declined as a result of actions taken in response to the tuna embargo.  Pl.'s Br. Ex. 6, Annual

Report: Administration of the MMPA, 1999–2000 (2000), at 62, 67.  Similarly, within a few years

of Congress' enacting a ban on the importation of shrimp caught in a manner that kills sea turtles,

the Government stated that Mexico, among other countries, "adopted a program to reduce the

---

[14] Although the Government claims that plaintiffs have not come forward with competent proof
that the United States is a significant export market for shrimp, chano, sierra, and curvina caught
with gillnets from the Upper Gulf of California, Def.'s Reply at 4–5, the record does support a
conclusion that the United States is a significant export market for those products.

incidental capture of sea turtles . . . comparable to the U.S. program."  Certifications Pursuant to

Section 609 of Public Law 101-162, 60 Fed. Reg. 24,962, 24,962 (May 10, 1995).  When Mexico's

turtle-safe practices declined, the United States again instituted a ban, and within a year Mexico's

turtle protections were once more "comparable to that of the United States."  Certifications

Pursuant to Public Law That 12 Nations Have Adopted Programs To Reduce the Incidental

Capture of Sea Turtles in Their Shrimp Fisheries, 76 Fed. Reg. 32,010, 32,010 (June 2, 2011).

        Moreover, although not dispositive, it is noteworthy that Congress chose embargoes as the

most effective remedy for foreign threats to marine mammals.  See, e.g., Kreps, 561 F.2d at 1010

("Congress, in enacting the MMPA, established as a matter of law the requisite causal relationship

between American importing practices and [foreign harvesting] practices."); Laidlaw, 528 U.S. at

185 (deferring to Congress's determination that civil penalties would deter future violations); Pub.

Citizen v. FTC, 869 F.2d 1541, 1549 (D.C. Cir. 1989) (stating courts "credit . . . congressional

determination[s]" in evaluating standing); Dellums v. U.S. Nuclear Regulatory Comm'n, 863 F.2d

968, 978 (D.C. Cir. 1988) ("Since . . . it is unseemly for a federal court to ignore . . . legislative

opinion, . . . Congress can provide legislative assessments which courts can credit in making

standing determinations . . . ." (internal quotation marks and citation omitted)).

        Several cases, including some decided by this Court, found standing under similar

circumstances.  For example, in Earth Island Inst. v. Christopher, 19 CIT 1461, 913 F. Supp. 559

(1995), appeal dismissed, 86 F.3d 1178 (Fed. Cir. 1996), this Court held that environmental

organizations had standing to challenge the government's inaction regarding imports of shrimp

harvested in a manner that harmed sea turtles covered by the Endangered Species Act.  The Court

reasoned that it was "safe to presume that the exporting countries do (and would) attempt to comply

with U.S. law" due to the size of the United States seafood export market.  Id. at 570.  Likewise,

in Humane Soc'y of U.S. v. Brown, 20 CIT 277, 311–12, 920 F. Supp. 178, 204 (1996), this Court

found that environmental organizations had standing to seek a declaration that Italian fisheries

used driftnets harmful to dolphins protected by the Driftnet Enforcement Act because plaintiffs

had presented evidence that the threat of trade sanctions against Italy had been previously

"effective in achieving adequate driftnet agreement and agreement compliance."  The D.C. Circuit

came to the same conclusion in Kreps when evaluating whether harm to plaintiffs' seal-watching

interests was fairly traceable to the Government's failure to enforce portions of the MMPA.  Citing

extensive negotiations with the South African government, South Africa's previous attempts to

comply with the MMPA, and Congress' intention in enacting the MMPA, the D.C. Circuit

determined that it was "impossible to conclude, as appellees urge us to, that the causal relationship

is 'purely speculative.'"  Kreps, 561 F.2d at 1009–10.

        The Government's contention that an import ban on legal fisheries will not redress

plaintiffs' harms because illegal totoaba fishing is the primary source of vaquita deaths is also

unpersuasive.  As an initial matter, the evidence shows that legal gillnet fisheries have caused

vaquita deaths, and even if a gillnet ban catalyzed by an embargo only reduced rather than

eliminated gillnet use in the vaquita's habitat, such a harm reduction would be sufficient to

establish standing, particularly in light of the fact that every vaquita death increases the likelihood

that the species will go extinct.  Massachusetts, 549 U.S. at 524 (rejecting "the erroneous

assumption that a small incremental step . . . can never be attacked in a federal judicial forum");

Humane Soc'y of U.S., 920 F. Supp. at 204 (finding standing was established because

"enforcement of the Driftnet Act will diminish, if not eliminate, the harm to [the dolphins] and

their plaintiff observers").  Moreover, plaintiffs have provided evidence showing that it is likely

that a complete gillnet ban would reduce illegal totoaba fishing by making enforcement easier,

including a report from CIRVA, CIRVA 9th Meeting Report, at 12, and the Government's own

statement that "[t]he curvina fishery provides cover for illegal [totoaba fishing and] . . . allows sale

and possession of gillnets, which not only complicates enforcement but also is likely to slow

transition to alternative fishing gears."  Good Stefani Decl. Ex. 8, NOAA Fisheries Apr. 25, 2017

Letter to Mexican Gov't (Apr. 25, 2017), at 1.

## III.   <u>A Preliminary Injunction is Warranted.</u>

The court now turns to plaintiffs' motion for a preliminary injunction requiring the

Government to ban the importation of fish and fish products from any Mexican commercial fishery

that uses gillnets within the vaquita's range.  "A preliminary injunction 'is an extraordinary

remedy.'"  <u>Silfab Solar, Inc. v. United States</u>, 892 F.3d 1340, 1345 (Fed. Cir. 2018) (quoting

<u>Winter v. Nat. Res. Def. Council</u>, 555 U.S. 7, 24 (2008)).   When ruling on a motion for a

preliminary injunction, the Court reviews four factors: (1) whether the plaintiffs are likely to

prevail on the merits of their claims; (2) whether the plaintiffs are likely to suffer irreparable harm

in the absence of a preliminary injunction; (3) the balance of equities; and (4) whether a

preliminary injunction is in the public interest. <u>Id.</u> at 1345; <u>Winter</u>, 555 U.S. at 20.  Upon review

of the record submissions accompanying the parties' filings, the court determines that each of the

four factors weighs in favor of a preliminary injunction, and thus grants plaintiffs' motion.

*A.  Plaintiffs Have a Fair Likelihood of Prevailing on the Merits.*

The party seeking a preliminary injunction must be able to "demonstrate that it has at least

a fair chance of success on the merits for a preliminary injunction to be appropriate."  <u>Silfab Solar</u>,

892 F.3d at 1345 (quoting <u>Wind Tower Trade Coal. v. United States</u>, 741 F.3d 89, 96 (Fed. Cir.

2014)).  Plaintiffs argue that they are likely to prevail on the merits of their claim because the

Imports Provision of the MMPA, using the mandatory "shall," imbues the Government with a duty

to "ban the importation of commercial fish or products from fish which have been caught with commercial fishing technology which results in the incidental kill . . . of ocean mammals in excess of United States standards." Pl.'s Br. at 18–19 (quoting 16 U.S.C. § 1371(a)(2)).  Plaintiffs assert that gillnets used in northern Gulf fisheries are a "commercial fishing technology" that is killing vaquita at rates that far exceed "United States standards," under two metrics.  Id. at 19.  First, plaintiffs argue that the MMPA requires United States fisheries to reduce their bycatch to below PBR, see supra p. 6, which NOAA Fisheries estimates for each marine mammal species.  Pl.'s Br. at 19 (citing 16 U.S.C. §§ 1386(a), 1387(f)(4), (5)); see Marine Mammal Stock Assessment Reports, 82 Fed. Reg. 29,039 (June 27, 2017) (responding to public comments for revisions of 2016 marine mammal stock assessment reports).  PBR is defined under § 1362(20) as "the maximum number of animals, not including natural mortalities, that may be removed from a marine mammal stock while allowing that stock to reach or maintain its optimum sustainable population."[15]  Here, plaintiffs contend that the Mexican government has failed to effectively manage its northern Gulf fisheries that deploy gillnets -- legally in its curvina and sierra fisheries, and illegally in its chano and shrimp fisheries -- and that operation of these gillnet fisheries causes vaquita bycatch in excess of the species' PBR.

Second, plaintiffs argue that the Mexican government has failed to impose regulatory measures ensuring its fisheries meet the PBR, consonant with United States standards for domestic

---

[15] "The potential biological removal level is the product of the following factors:

    (A) The minimum population estimate of the stock.
    (B) One-half the maximum theoretical or estimated net productivity rate of the stock at a small population size.
    (C) A recovery factor of between 0.1 and 1.0."

16 U.S.C. § 1362(20).

fisheries required by the MMPA.  Pl.'s Br. at 21.  Specifically, NOAA Fisheries must develop a

"take reduction plan" for at-risk marine mammal stocks containing regulatory measures

"expect[ed]" to reduce bycatch to below PBR. 16 U.S.C. §§ 1387(f)(1), (4)–(5), 1362(19).

Plaintiffs contend that this requirement is part of the "United States standards" that other nations

must meet in order to export fish to the United States pursuant to the Imports Provision, §

1371(a)(2).  Pl.'s Br. at 21; see 50 C.F.R § 216.24(h)(6)(iii)(C)(1), (3)–(4) (requiring foreign

fisheries seeking to export to the United States to demonstrate the nation has adopted a regulatory

program designed to reduce bycatch to below PBR).  In addition, plaintiffs argue that extant

Mexican regulations limiting gillnet usage have proven incomplete, ineffectual, and under-

enforced.  Pl.'s Br. at 22 (citing Ragen Decl. ¶ 22).

The Government responds that the ban under the Imports Provision activates only upon an

affirmative finding by the Secretary of Commerce that marine mammals are being incidentally

killed in excess of United States standards.[16]  Oral Arg.  NOAA Fisheries provided in the

Regulation that "United States standards" refers to "any fish or fish product harvested in an exempt

or export fishery for which a valid comparability finding is not in effect" following the exemption

period that expires on January 1, 2022.  50 C.F.R. § 216.24(h)(1)(i), (2)(ii); see id. § 216.3.  The

Government asserts that the court must defer to this definition of "United States standards"

pursuant to Chevron, U.S.A., Inc. v. Nat. Res. Def. Council, Inc., 467 U.S. 837, 842–43 & n.11

(1984).  Def.'s Br. at 20.  The Government thus argues that the PBR is not equivalent to "United

States standards" under either the MMPA or the Regulation, and therefore vaquita bycatch in

---

[16] The Government also submits that plaintiffs are unlikely to succeed on the merits of their claim
because they lack standing to bring it.  Def.'s Br. at 20 (citing U.S. Ass'n of Imp. of Textiles &
Apparel v. U.S. Dep't of Commerce, 413 F.3d 1344, 1350 (Fed. Cir. 2005)).  This argument is
unpersuasive because, as explained above, plaintiffs possess standing to bring their claim, and the
court possesses jurisdiction to adjudicate it.

excess of PBR does not activate the duty to ban imports under the Imports Provision.  In addition, the Government asserts that the primary driver of vaquita bycatch is illegal gillnet fishing for totoaba in the vaquita's range, which is unlikely to be reduced by a ban on importation of shrimp, chano, sierra, or curvina to the United States.  Def.'s Br. at 21–22.

Upon review of the record submitted in support of plaintiffs' motion for a preliminary injunction, the court concludes that plaintiffs have demonstrated that they have a fair likelihood of success on the merits of their claim.  As explained above at pp. 17–22, the import ban requested here is both discrete and mandatory for the purposes of the APA.  The text of the Imports Provision imposes on the Government an immediate and continuous duty to ban fish caught with fishing gear that kills marine mammals, such as the vaquita, in excess of United States standards.  16 U.S.C. § 1371(a)(2).  By the terms of that statute, it is the immediate goal that bycatch be "reduced to insignificant levels approaching a zero mortality and serious injury rate."  Id.

Relatedly, there is a fair likelihood that quite apart from the "zero mortality and serious injury rate" goal set forth in the statute to protect against the incidental kill or incidental serious injury of ocean mammals caught by commercial fishing operations, 16 U.S.C. § 1371(a)(2), plaintiffs have established that PBR level is also a marker of "United States standards" for the purposes of the Imports Provision, and that United States standards for permissible incidental kills of the vaquita have been exceeded in northern Gulf gillnet fisheries.  The MMPA contains multiple provisions which direct NOAA Fisheries to limit marine mammal bycatch on the basis of PBR. Section 1386(a) directs NOAA Fisheries to "prepare a draft stock assessment for each marine mammal stock which occurs in waters under the jurisdiction of the United States," which includes a description of "commercial fisheries that interact with the stock," "an analysis stating whether such level is insignificant and is approaching a zero mortality and serious injury rate," and an

estimation of "the [PBR] level for the stock." Id. § 1386(a)(4), (6).  The MMPA instructs that marine mammals "should not be permitted to diminish below their optimum sustainable population," and that "whenever consistent" with the primary objective of maintaining the health and stability of the marine ecosystem, "it should be the goal to obtain an optimum sustainable population keeping in mind the carrying capacity of the habitat." Id. § 1361(2), (6).

Section 1386(a)(5)(A)–(B) commands NOAA Fisheries to categorize the stock as one that either "has a level of human-caused mortality and serious injury that is not likely to cause the stock to be reduced below its optimum sustainable population" or "is a strategic stock." A "strategic stock" is, in relevant part, a marine mammal stock "for which the level of direct human-caused mortality exceeds the potential biological removal level," one which is declining and likely to be listed as a threatened species under the ESA, or one which is already listed as a threatened or endangered species under the ESA.  Section 1387, "Taking of marine mammals incidental to commercial fishing operations," directs NOAA Fisheries to "develop and implement a take reduction plan designed to assist in the recovery or prevent the depletion of each strategic stock." Id. § 1387(f)(1).  The take reduction plan's immediate goal (as enacted in the MMPA's 1994 amendments), shall be to reduce fishery-related mortality and serious injury "to levels less than the potential biological removal level established for that stock" within six months, and the long-term goal shall be to reduce bycatch levels "to insignificant levels approaching a zero mortality and serious injury rate" within five years.  Id. § 1387(f)(2).

Quite apart from the established legal principle that a rule cannot supplant the statute under which it is promulgated, see Util. Air. Regulatory Grp. v. EPA, 134 S. Ct. 2427, 2446 (2014), the Regulation does not function to forestall application of the statutory moratorium on imports effected by § 1371(a) and (a)(2) because, by its own terms, "[t]he prohibitions of paragraph (h)(1)

of this section shall not apply during the exemption period." 50 C.F.R. § 216.24(h)(2)(ii).  This

means that the comparability finding regime, see supra pp. 7–8, imposed by the Regulation does

not go into effect until January 1, 2022;[17] however, there is no statutory provision in the MMPA

which delays its application until that regulatory exemption period expires.

In fact, as recited in this opinion, multiple provisions of the MMPA stress that the statute

is undergirded and propelled by a sense of urgency that mammals like the vaquita not be killed

and brought to extinction, even if unintentionally.  For starters, as has been discussed, the Imports

Provision itself states that "[i]n any event it shall be the immediate goal that the incidental kill or

incidental serious injury of marine mammals permitted in the course of commercial fishing

operations be reduced to insignificant levels approaching a zero mortality and serious injury rate."

16 U.S.C. § 1371(a)(2) (emphasis added); see Kokechik, 839 F.2d at 801.  As further noted above,

the "moratorium on the taking and importation of marine mammals and marine mammal products"

commenced "on the effective date of this chapter."  16 U.S.C. § 1371(a).[18]  The emergency

rulemaking provision, § 1387(g)(1), too speaks to the act's immediacy.  As mentioned, under that

provision, the Secretary of Commerce "shall" undertake emergency rulemaking actions if he or

_____

[17] Even so, the court notes that indicative of the statutory focus on PBR, the comparability finding regime implicated by the Regulation, 50 C.F.R. § 216.24(h)(1), commands NOAA Fisheries to determine whether a foreign harvesting nation maintains a regulatory program centered around a marine mammal species' "bycatch limit." 50 C.F.R. § 216.24(h)(6)(iii)(C). Specifically, the Regulation requires that a foreign fishery demonstrate that it does "not exceed the bycatch limit for that [marine mammal] stock or stocks" individually or cumulatively. Id. § 216.24(h)(6)(iii)(C)(6).

[18] As has been noted, among the Congressional findings animating the MMPA is a statement that marine mammal "species and population stocks should not be permitted to diminish beyond the point at which they cease to be a significant functioning element in the ecosystem of which they are a part, and, consistent with this major objective, they should not be permitted to diminish below their optimum sustainable population." Id. § 1361(2). Additionally, "measures should be immediately taken to replenish any species or population stock which has already diminished below that population." Id.

she "finds that the incidental mortality and serious injury of marine mammals from commercial

fisheries is having, or is likely to have, an immediate and significant adverse impact on a stock or

species."

Indeed, reflecting the urgency of the MMPA's emergency rulemaking provision, 16 U.S.C.

§ 1387(g), the Federal Register entry implementing the Regulation, which, as the court has

explained, becomes effective in January 2022, see 50 C.F.R. §§ 216.24(h)(2)(ii), 216.3, provides

that during the five-year interim exemption, NOAA Fisheries "would likewise consider an

emergency rulemaking for an export or exempt fishery having or likely to have an immediate and

significant adverse impact on a marine mammal stock interacting with that fishery." 81 Fed. Reg.

at 54,395 (emphasis added) (citing 16 U.S.C. § 1387(g)).   The proffered justification for this

language bears restatement:

> The emergency regulations or measures allow for timely treatment of cases where
> the usual process and timeframe could result in unacceptable risks to the affected
> marine mammal stock or species.  Logically, such risks would result either from
> very small populations where any incidental mortality could result in increased risk
> of extinction or larger populations with substantial mortality that could become
> very small populations within the timeframe taken by the standard management
> process; in either situation these cases represent an unacceptable ecological risk.

Id.

Plaintiffs successfully argue that vaquita are being incidentally killed by gillnets in the

northern Gulf fisheries in excess of their PBR.  Plaintiffs present a letter sent to the Mexican

government on February 15, 2018, wherein NOAA Fisheries -- a defendant here -- calculated the

PBR for vaquita to be 0.032 animals a year based on the species' estimated 2016 abundance, or

0.017 based on 2017 numbers; these values translate to one permissible mortality about every

thirty-one or sixty-one years, respectively.   NOAA Fisheries Feb. 15, 2018 Letter to

CONAPESCA, at 12.  NOAA Fisheries stated that "[t]he risk to and decline of vaquita is primarily

attributable to one factor: bycatch in gillnets. . . . [T]he use of gillnets by any fishery in the vaquita's range is incompatible with the survival of the species." Id. at 7.  The letter also acknowledges that in 2016 and 2017, three vaquita per year were confirmed to be killed in gillnets, and that "three per year in gillnets is over . . . 180 times higher than the PBR for 2017."  Id. at 12; see CIRVA 7th Meeting Report, at 5, 16 (reporting three vaquita killed in gillnets in 2016); CIRVA 9th Meeting Report, at 13 (discussing the five vaquita found dead between March and April of 2017 and including the necropsy reports for each vaquita), 26–30 (listing the cause of death of the vaquita in their official necropsy reports as "Fisheries bycatch," "Unknown," "Unknown," "Suspect fisheries bycatch," and "Trauma, entanglement").  NOAA Fisheries concluded that "even one bycatch [of] vaquita presents a significant risk to the continued existence of the population." NOAA Fisheries Feb. 15, 2018 Letter to CONAPESCA, at 12.[19]  In addition, NOAA Fisheries'

---

[19] NOAA Fisheries' February 15, 2018 Letter to CONAPESCA states, in relevant part:

> An assessment of risk includes, by U.S. standards and in the MMPA Import Rule, the calculation of a bycatch limit.  In the United States, NMFS determines a fisheries bycatch limit by calculating the "potential biological removal" (PBR), which is the "maximum number of animals…that may be removed…while allowing that stock to reach or maintain its optimum sustainable population." Under the MMPA, PBR is calculated as 0.5 * Nmin * Rmax * Fr, where Nmin is the 20th percentile estimate for population size; Rmax is the maximum net productivity estimate; and Fr is a recovery factor.  For vaquita, the appropriate PBR parameters are: Nmin of 16 animals (based on the 2016 population estimate) or 8 animals (based on the 2017 population estimate); Rmax of 0.04 (default productivity rate for cetaceans, although the productivity rate for vaquita is expected to [sic] lower than 0.04); and a recovery factor of (Fr) of 0.1 (the default value for endangered stocks. [sic]  The PBR for 2016 and 2017 would be 0.032 and 0.017 respectively.  At this rate, only one vaquita could be killed roughly every 31.25 or 61.5 years.

> A total of 6 of 9 dead vaquitas killed in the past 2 years were confirmed to be killed in gillnets.  The minimum known mortality of three per year in gillnets is over 90 times the PBR for 2016 and 180 times higher than the PBR for 2017.  In comparison, the vaquita experienced a population decline of nearly 50 percent between 2015 and 2016, with only approximately 30 vaquita remaining as of

own scientists have stated that the vaquita's "extinction is . . . inevitable unless gillnets are completely removed from vaquita habitat." Good Stefani Decl. Ex. 21, Extinction is Imminent for Mexico's Endemic Porpoise Unless Fishery Bycatch is Eliminated (Oct. 24, 2016), at 6.

As the record evinces, vaquita have been observed to have been entangled in gillnets set by the shrimp, sierra, and chano fisheries. Vaquita Bycatch in Mexico's Artisanal Gillnet Fisheries, at 1118 (observing the direct mortality of three vaquita in shrimp, one vaquita in sierra, and four vaquita in chano gillnets from January 26, 1993 to January 25, 1994); NOAA Fisheries Feb. 15, 2018 Letter to CONAPESCA, at 7. Regarding the fourth fishery, which targets curvina, NOAA Fisheries has concluded that the "likelihood of bycatch in the corvina fishery is more than remote, and the outcome of even one instance of vaquita bycatch presents a significant risk to the continued existence of the population." NOAA Fisheries Feb. 15, 2018 Letter to CONAPESCA, at 7. More broadly, NOAA Fisheries has found that "vaquita are incidentally caught in . . . most, if not all, types of gillnets used" in the northern Gulf of California. NOAA Fisheries: Vaquita Conservation and Abundance, at 1. Acting pursuant to its statutorily mandated advisory capacity, the MMC -- an independent U.S. agency created by the MMPA -- submitted a letter to NOAA Fisheries in March 2017, advising it had "sufficient information to indicate that all gillnet fisheries that incidentally catch vaquitas are employing a fishing technology that kills . . . marine mammals in excess of U.S. standards." MMC Mar. 1, 2017 Letter to NOAA Fisheries, at 2; 16 U.S.C. §

_____

November 2016. With gillnet bycatch the primary driver of vaquita decline, gillnet fisheries in and adjacent to their range are producing a mortality rate well in excess of PBR. In conclusion, based on the available information, the likelihood of bycatch in the corvina fishery is more than remote, and the outcome of even one bycatch vaquita presents a significant risk to the continued existence of the population.

NOAA Fisheries Feb. 15, 2018 Letter to CONAPESCA, at 12 (citations omitted).

1401(a).  In a follow-up letter sent to NOAA Fisheries on September 21, 2017, the MMC affirmed

that "[n]umerous fisheries in the upper Gulf of California that involve the use of gillnets, regardless

of the target species, could contribute to mortality of vaquitas."  MMC Sept. 21, 2017 Letter to

NOAA Fisheries, at 3.

The court is unpersuaded that there is material legal relevance to the Government's

assertion that the primary driver behind incidental vaquita death in excess of PBR is gillnet usage

in illegal totoaba fishing.  The record does not indicate that vaquita bycatch is due solely to illegal

totoaba fishing with gillnets, and, as noted supra pp. 9–14, vaquita deaths in the other Gulf fisheries

at issue are documented, or reasonably likely to occur.  The fact that illegal totoaba fishing also

incidentally kills vaquita does not detract from the evidenced conclusion that gillnet fishing of all

varieties in the northern Gulf of California threatens vaquita.  If anything, the record demonstrates

only that the curvina fishery, which entirely deploys legal gillnets, acts as a cover for illegal totoaba

fishing with gillnets.  MMC Mar. 1, 2017 Letter to NOAA Fisheries, at 1; NOAA Fisheries Apr.

25, 2017 Letter to Mexican Gov't, at 2; NOAA Fisheries Feb. 15, 2018 Letter to CONAPESCA,

at 13 (noting that the curvina fishery "may facilitate the much more lucrative illegal fishing of

totoaba").

Plaintiffs also establish a fair likelihood that the United States standards protections

mandated under the MMPA's Imports Provision are significantly impacted by the foreign

harvesting nation's regulatory program.  In a January 17, 2018 letter from NOAA Fisheries to the

Government of Mexico, the agency listed regulatory measures that Mexico should take "to protect

vaquita from gillnet entanglement" and avoid the "need for action under [the] MMPA."[20]  Good

---

[20] These include, but are not limited to, a ban on all gillnets fisheries inside the vaquita's range
"including the curvina and sierra fisheries"; a prohibition on the sale or possession of gillnets in
the area; a requirement that "all gillnets be surrendered or confiscated and destroyed"; a vessel

Stefani Decl. Ex. 16, NOAA Fisheries Jan. 17, 2018 Letter to CONAPESCA (Jan. 17, 2018), at 1.

NOAA Fisheries in its February 15, 2018 letter asked Mexico to "commit to working closely with

[experts] to develop a scientifically robust protocol for testing alternative gear, and that it develop

an implementation plan to train fishermen and socialize the use of alternative gear throughout the

upper Gulf" in order to achieve gillnet-free fisheries.   NOAA Fisheries Feb. 15, 2018 Letter to

CONAPESCA, at 5.  The record demonstrates that possible alternative gear including "traps, pots,

trolling, fish trawls, fyke nets, and others" is available for usage in the Mexican fisheries, but no

evidence suggests that Mexico has yet instituted an effective alternative gear program.   CIRVA

8th Meeting Report, at 9; see CIRVA 10th Meeting Report, at 13; NOAA Fisheries Feb. 15, 2018

Letter to CONAPESCA, at 5.   Further, NOAA Fisheries urged the Mexican Government to

increase regulatory enforcement in the Gulf of California in order to prevent incidental vaquita

deaths, and offered suggestions for doing so, in its April 2017 letter.   NOAA Fisheries Apr. 25,

2017 Letter to Mexican Gov't, at 2.   NOAA Fisheries concluded that "the choice is simple and

stark: either gillnetting in the Upper Gulf ends, or the vaquita becomes extinct within a very short

time."   Id.   In its September 2017 letter to NOAA Fisheries, the MMC stated that Mexico's

regulatory program "cannot be considered comparable in effectiveness to the U.S. regulatory

program."  MMC Sept. 21, 2017 Letter to NOAA Fisheries, at 2.  In support of its conclusion, the

MMC detailed the inadequacy of Mexico's regulatory efforts, which are unlikely "to prevent

extinction, much less to provide for conservation and recovery of the species."   Id.   Altogether,

these communications strongly indicate an ongoing determination on part the of United States

---

inspection program "for each fishing trip at the point of departure and landing"; increased
enforcement efforts combined with monthly reporting to NOAA Fisheries and CIRVA of the total
"number of inspections, interdictions, arrests, sentences, and other enforcement actions"; and a
plan to "incentivize the conversion of the [gillnet] fleet to gillnet-free operations."  Good Stefani
Decl. Ex. 16, NOAA Fisheries Jan. 17, 2018 Letter to CONAPESCA (Jan. 17, 2018), at 1–2.

agencies that the Mexican regulatory regime permits incidental vaquita deaths in excess of United

States standards.

### B. Plaintiffs are likely to Suffer Irreparable Harm Without a Preliminary Injunction.

The court now considers whether plaintiffs are likely to suffer irreparable harm in the

absence of a preliminary injunction compelling the Government to embargo the imports at issue.

Silfab Solar, 892 F.3d at 1345 (citing Winter, 555 U.S. at 20).  A harm is irreparable when "no

damages payment, however great," could address it.  Celsis In Vitro, Inc. v. CellzDirect, Inc., 664

F.3d 922, 930 (Fed. Cir. 2012).  "However, the injury complained of need not have been inflicted

when the application is made, or be certain to occur."  Sunpreme Inc. v. United States, 40 CIT ___,

___, 181 F. Supp. 3d 1322, 1330 (2016) (citing United States v. W.T. Grant Co., 345 U.S. 629,

633 (1953)).

"Environmental injury, by its nature, can seldom be adequately remedied by money

damages and is often permanent or at least of long duration, i.e., irreparable."  Fed'n of Japan

Salmon Fisheries Co-op. Ass'n v. Baldridge, 679 F. Supp. 37, 48 (D.D.C. 1987) (quoting Amoco

Prod. Co. v. Gambell, 480 U.S. 531, 545 (1987)), aff'd and remanded sub nom. Kokechik, 839

F.2d 795.  The likely, imminent extinction of a species in the absence of statutorily mandated

action constitutes irreparable harm.  See Nat'l Wildlife Fed'n v. Nat'l Marine Fisheries Serv., 886

F.3d 803, 821 (9th Cir. 2018) (affirming a preliminary injunction requiring increased dam spill to

protect endangered salmon based, in part, on "the continued low abundance" of the species and

the fact that salmon were "vulnerable to extinction" as a result); see also Tennessee Valley Auth.

v. Hill, 437 U.S. 153, 187–88 (1978) (enjoining multimillion-dollar dam to protect snail darter

from extinction based on the public's interest in the "incalculable" value of preserving endangered

species).  Here, plaintiffs have shown irreparable harm to their own interests by virtue of the likely

irreparable harm to the vaquita.  As explained supra pp. 25–26, plaintiffs adequately demonstrate

an imminent injury for standing purposes partially because their enjoyment of the vaquita is

directly implicated by the threat of gillnet fishing to the species' survival.  See, e.g., All. for the

Wild Rockies v. Cottrell, 632 F.3d 1127, 1135 (9th Cir. 2011) (upholding a finding of irreparable

harm where plaintiff organization asserted "that the Project will harm its members' ability to 'view,

experience, and utilize' the areas in their undisturbed state").  In 2016, the vaquita population

plummeted to around thirty animals, representing a forty-nine percent population decline in a

single year.  Good Stefani Decl. Ex. 24, Last Call: Passive Acoustic Monitoring Shows Continued

Rapid Decline of Critically Endangered Vaquita (Nov. 2017), at EL512; CIRVA 8th Meeting

Report, at 4.  CIRVA found that by November 2017, the population dropped further to a mere

fifteen individuals.  CIRVA 10th Meeting Report, at 2, 5.  It is unknown, and the record does not

illuminate, how many living vaquita are females, or how many are capable of reproducing.  Even

a single death would hamper the vaquita's likelihood of recovery, and increase its risk of

extinction.  See Jefferson Decl. ¶ 15.  As noted, NOAA Fisheries' scientists have stated that the

vaquita's "extinction is . . . inevitable unless gillnets are completely removed from vaquita

habitat."  Extinction is Imminent for Mexico's Endemic Porpoise Unless Fishery Bycatch is

Eliminated, at 6.

A determination of irreparable harm should also be guided by reference to the purposes of

the statute being enforced.  Tennessee Valley Auth., 437 U.S. at 184–88; Amoco Prod. Co., 480

U.S. at 544; see also Nat'l Wildlife Fed'n, 886 F.3d at 818; Sierra Club v. Marsh, 872 F.2d 497,

502–03 (1st Cir. 1989) (stating that the kinds of harms that may be irreparable "will be different

according to each statute's structure and purpose").  Among the central purposes of the MMPA

are the protection of marine mammals with sound policies and resource management, and the

maintenance of marine mammals at their optimum sustainable population.  16 U.S.C. § 1361.  In

line with that reasoning, this Court has held that "one way to show irreparable injury would be for

Plaintiffs to provide evidence that this number [of marine mammal mortalities allowed under the

MMPA] would be exceeded."  Defs. of Wildlife v. Dalton, 24 CIT 258, 260 n.6, 97 F. Supp. 2d

1197, 1200 n.6 (2000).  As explained in the preceding section of the opinion, plaintiffs have

provided evidence, and compellingly argued, that the number of permissible vaquita deaths under

the MMPA is being exceeded, that an embargo is legally required, and that the species is at risk of

extinction.

     *C.  The Balance of Equities Favors Granting a Preliminary Injunction.*

     The court now "must balance the competing claims of injury and must consider the effect"

that granting or denying a preliminary injunction will have on each party.  Winter, 555 U.S. at 24

(quoting Amoco Prod. Co., 480 U.S. at 542).  Plaintiffs assert that costs of implementing a

preliminary injunction to the Government would be relatively light, consisting of routine

administrative duties.  Pl.'s Br. at 30.  On the other hand, plaintiffs contend that the costs of

declining to preliminarily enjoin the Government would increase the risk that the vaquita will go

extinct, or irretrievably decline in population, by the conclusion of the litigation before this court.

Id.  The Government argues that granting the preliminary injunction would threaten high-level

negotiations with Mexico regarding the vaquita and other species harmed by commercial fishing

practices in the Gulf of California, which "are at a critical and sensitive time."  Def.'s Br. at 23

(citing Rauch Decl. ¶ 6).  The Government posits that denying the application for preliminary

relief, however, "could ultimately result in an import ban concerning one or more of the fisheries

for which plaintiffs have requested an injunction."  Id. at 23–24.

The balance of equities weighs in favor of granting a preliminary injunction. As discussed, when weighing the factors for a preliminary injunction, the court should be guided by Congress' purpose in enacting the underlying statute. Tennessee Valley Auth., 437 U.S. at 184–88. The court has noted multiple times that the purpose of the MMPA is, in summary, the preservation of marine mammal species. 16 U.S.C. § 1361. As the evidence in the record before the court makes clear, the vaquita's survival would be under a greater threat without the imposition of the embargo on the imports of fish and fish products from the gillnet fisheries at issue, which, as explained supra pp. 33–44, is legally required under the Imports Provision, § 1371(a)(2). Beyond the threat to plaintiffs' interests that derives directly from the threat to the vaquita's survival, established in prior sections, loss of the species prior to the end of this litigation would also moot the substantive legal contention under the Imports Provision, and thus foreclose plaintiffs' access to meaningful judicial review. See Kwo Lee, Inc. v. United States, 38 CIT ___, ___, 24 F. Supp. 3d 1322, 1327, 1331 (2014) (citing Doran v. Salem Inn, Inc., 422 U.S. 922, 932 (1975)). As noted above, in other cases, the Government has been ordered by this and other federal courts to institute embargos pursuant to environmental statutes. See Earth Island Institute v. Christopher, 913 F. Supp. at 579–80 (enjoining shrimp imports under the Endangered Species Act to protect sea turtles); Earth Island Institute v. Mosbacher, 929 F.2d 1449 (affirming grant of injunction on importation of yellowfin tuna from Mexico under the MMPA to protect dolphins).[21] The administrative inconvenience of

---

[21] The court is unpersuaded by the Government's claim that a preliminary injunction is not appropriate here because it would result in "an indefinite ban on imports," providing plaintiffs with "complete relief on the merits of their claim." Def.'s Br. at 19. "[A] preliminary injunction normally lasts until the completion of the trial on the merits, unless it is dissolved earlier." Fundicao Tupy S.A. v. United States, 841 F.2d 1101, 1103 (Fed. Cir. 1988) (citation omitted). Plaintiffs here seek a temporary ban on fish imports from the northern Gulf of California that are killing vaquita in excess of United States standards until the court resolves the case on the merits, at which point it can issue a permanent injunction, if appropriate. The preliminary injunction can be modified or lifted as the circumstances warrant; it does not provide complete relief. The

administering an embargo can be characterized as routine.  See SSAB N. Am. Div. v. U.S. Bureau

of Customs & Border Prot., 32 CIT 795, 801, 571 F. Supp. 2d 1347, 1353 (2008) (recognizing that

an agency's "administrative inconvenience associated with" implementing preliminary injunction

was routine because the agency "ha[d] some familiarity with such a task").  The Government's

suggestion that the institution of an embargo on the products in question would undermine high-

level negotiations between the United States and Mexico is unpersuasive.  Negotiations between

the two countries have been ongoing since at least 2015.  See Gov't of Mexico Sept. 21, 2017

Letter to NOAA Fisheries, at 14.  No evidence submitted by the Government affirmatively shows

that the institution of an embargo under the Imports Provision, as required by United States law,

would undermine international negotiations, and any outcome to that effect is speculative.  See

Rauch Decl.  In any event, it is beyond the province of the court to engage in such prognostication

or to ignore the Congressional directive reflected in the Imports Provision.

   D.  A Preliminary Injunction is in the Public Interest.

   Finally, the court considers whether granting a preliminary injunction would benefit the

public interest, Silfab Solar, 892 F.3d at 1345 (citing Winter, 555 U.S. at 20), and concludes that

it would.  As an initial matter, "[t]he public interest is served by ensuring that governmental bodies

comply with the law."  Am. Signature, Inc. v. United States, 598 F. 3d 816, 830 (Fed. Cir. 2010);

---

Government's contention that a preliminary injunction here is inappropriate because it does not preserve the status quo is also without merit.  That the preliminary injunction would require the Government to impose a ban such that it would thereby be in compliance with the MMPA does not render the preliminary injunction inappropriate.  See, e.g., Atlas Powder Co. v. Ireco Chems., 773 F.2d 1230, 1231 (Fed. Cir. 1985).  The purpose of a preliminary injunction is "to preserve the trial court's power to provide an effective remedy on the merits."  Fundicao Tupy, 841 F.2d at 1103.  The temporary ban is consistent with that purpose.  A "[preliminary] injunction is appropriate when the policy of preserving the court's power to decide the merits of a case outweighs the burden of imposing an interim restraint before it can do so."  Id.  That guidance informs the calculus here, where plaintiffs seek to preserve a species headed toward extinction.

accord N.M. Garlic Growers Coal. v. United States, 41 CIT ___, ___, 256 F. Supp. 3d 1373, 1377

(2017); see also Conservation Law Foundation v. Watt, 560 F. Supp. 561, 563 (D. Mass. 1983)

(holding that, in light of the "special consideration as to the preservation of endangered species,"

"[i]t is plain that the public interest calls upon the courts to require strict compliance with

environmental statutes") (Mazzone, J), aff'd sub nom. Mass. v. Watt, 716 F.2d 946 (1st Cir. 1983).

As noted above, citing negotiations with Mexico, albeit protracted, the Government urges that the

court consider its views that in the context of those discussions, an embargo might not be the "best

course of action for conserving the vaquita." Def.'s Br. at 17. However, it is not for this court to

consider those concerns. Here, Congress has determined the action to be taken. In this case, for

the reasons detailed above, the law commands that under the Imports Provision, the Secretary of

the Treasury shall ban imports of fish and fish products from northern Gulf fisheries that utilize

gillnets and incidentally kill vaquita in excess of United States standards.

Like the irreparable harm inquiry and the balance of the equities, the public interest inquiry

is guided by reference to "the underlying statutory purposes at issue." SSAB, 571 F. Supp. 2d at

1353 (citing Amoco Prod. Co., 480 U.S. at 544–46); see Tennessee Valley Auth., 437 U.S. at 193–

94. A preliminary injunction ordering an embargo on fish and fish products from the gillnet

fisheries at issue would effectuate the MMPA's purpose of preserving marine mammal

populations, in this case, the vaquita, which the Government acknowledges is on the verge of

extinction. See 16 U.S.C. § 1361. While plaintiffs and the Government argue about remedy, what

cannot be disputed is that the vaquita's plight is desperate, and that even one more bycatch death

in the gillnets of fisheries in its range threatens the very existence of the species. In granting the

preliminary injunction ordering the embargo set forth in the statute, the court is simply directing

compliance with a Congressional mandate that an import ban be imposed where marine mammals

are killed at unsustainable rates because of commercial fishing technology used to catch other species.[22]

## CONCLUSION

The court denies the Government's motion to dismiss, and grants plaintiffs' motion for a preliminary injunction requiring the Government, pending final adjudication of the merits, to ban the importation of all fish and fish products from Mexican commercial fisheries that use gillnets within the vaquita's range.

**SO ORDERED.**

/s/     *Gary S. Katzmann*
Gary S. Katzmann, Judge

Dated: July 26, 2018
New York, New York

---

[22] Having considered the relatively small routine administrative costs associated with implementing the import ban and the interest in preserving plaintiffs' ability to obtain judicial review of the Government's conduct, the court, in its discretion, requires plaintiffs to post $1.00 as security. See USCIT R. 65(c); see generally Zenith Radio Corp. v. United States, 2 CIT 8, 518 F. Supp. 1347 (1981) (discussing the court's discretion in setting security, particularly when granting a preliminary injunction to preserve plaintiff's access to judicial review); 11A Charles Allan Wright & Arthur R. Miller, Federal Practice and Procedure § 2954 (3d ed. Apr. 2018 Update).