Slip Op. 18-100

# UNITED STATES COURT OF INTERNATIONAL TRADE

|  |  |
|---|---|
| NATURAL RESOURCES DEFENSE COUNCIL, INC., CENTER FOR BIOLOGICAL DIVERSITY, and ANIMAL WELFARE INSTITUTE,<br><br>                    Plaintiffs,<br><br>          v.<br><br>WILBUR ROSS, *in his official capacity as Secretary of Commerce*, UNITED STATES DEPARTMENT OF COMMERCE, CHRIS OLIVER, *in his official capacity as Assistant Administrator of the National Marine Fisheries Service*, NATIONAL MARINE FISHERIES SERVICE, STEVEN MNUCHIN, *in his official capacity as Secretary of the Treasury*, UNITED STATES DEPARTMENT OF THE TREASURY, KIRSTJEN NIELSEN, *in her official capacity as Secretary of Homeland Security*, and UNITED STATES DEPARTMENT OF HOMELAND SECURITY,<br><br>                    Defendants. | Before: Gary S. Katzmann, Judge<br><br>Court No. 18-00055 |

## OPINION

[Addressing defendants' motion to clarify and issuing an updated order.]

Dated: August 14, 2018

Giulia C.S. Good Stefani and Daniel N. Carpenter-Gold, Natural Resources Defense Council, of Santa Monica, CA, argued for plaintiffs. With them on the brief were Stephen Zak Smith for plaintiff, Natural Resources Defense Council Inc. and Sarah Uhlemann, of Seattle, WA, for plaintiffs, Center for Biological Diversity, and Animal Welfare Institute.

Agatha Koprowski, Trial Attorney, Commercial Litigation Branch, Civil Division, U.S. Department of Justice, of Washington, DC, argued for defendant.  With her on the brief were Chad A. Readler, Acting Assistant Attorney General, Jeanne E. Davidson, Director, and Patricia M. McCarthy, Assistant Director.  Of counsel on the brief were Jason Forman, National Oceanic and Atmospheric Administration, of Silver Spring, MD; Daniel J. Paisley, Department of the Treasury, of Washington, DC; and Glenn Kaminsky, Department of Homeland Security, of New York, NY.

Katzmann, Judge: On July 26, 2018, presented with the desperate plight of the vaquita --
the world's smallest porpoise, now on the verge of extinction as they are caught and strangled in
the gillnets of fisheries in the Northern Gulf of California in Mexican waters -- this Court granted
"plaintiffs' [Natural Resources Defense Council, Center for Biological Diversity, and Animal
Welfare Institute] motion for a preliminary injunction requiring the Government, pending final
adjudication of the merits, to ban the importation of all fish and fish products from Mexican
commercial fisheries that use gillnets within the vaquita's range." Nat. Res. Def. Council v. United
States, 42 CIT ___, Slip Op. 18-92 (July 26, 2018) ("NRDC I") at 49.  The Government (herein
the collective reference to several United States agencies and officials) now returns to this Court,
seeking to limit the scope of the preliminary injunction and also to question whether the
preliminary injunction is effective immediately.

The Court must observe that in the short days that have intervened since the issuance of
the preliminary injunction, there has been no reduction in the risk to the vaquita by gillnet death,
and it is undisputed that "even one more bycatch death in the gillnets of fisheries in its range
threatens the very existence of the species." NRDC I at 48.  The Court todays holds that there
should be no doubt, as NRDC I made clear, that the Government is enjoined and ordered to ban
the importation from Mexico of all shrimp, curvina, sierra, and chano fish and their products caught
with gillnets inside the vaquita's range.   Furthermore, as that opinion also makes clear, there is a
real danger that the vaquita will disappear from the planet.  Consequently, the import ban ordered
by the Court pursuant to the Marine Mammal Protection Act ("MMPA") is effective immediately.
Finally, to facilitate future action, the Court issues an updated order, reproduced in the Appendix
below.

## BACKGROUND

The Court explained in NRDC I that the vaquita is a critically endangered marine mammal endemic to the northern Gulf of California, in Mexican waters. NRDC I at 2. It is the world's smallest porpoise, measuring only about five feet long and weighing one hundred pounds. Id. The vaquita's population has plummeted from 567 in the late 1990s, when it was first surveyed, to approximately fifteen today. Id. The status of the species is so precarious that even one mortality could increase the likelihood of extinction. Id. It is undisputed that the cause of the vaquita's precipitous decline is its inadvertent tangling, strangulation, and drowning in gillnets, which are fishing nets hung in the water to entangle fish and shrimp. Id.

In the hopes of avoiding exactly this type of disaster, Congress in 1972 enacted the MMPA, Pub. L. No. 92-522, 86 Stat. 1027 (codified as amended in scattered sections of 16 U.S.C.). That Act commands "that the incidental kill or incidental serious injury of marine mammals permitted in the course of commercial fishing operations be reduced to insignificant levels approaching a zero mortality and serious injury rate." 16 U.S.C. § 1371 (a)(2). Invoking the conditional ban on imports of fish and fish products found in Section 101(a)(2) of the MMPA, 16 U.S.C. § 1371(a)(2) (2012),[1] also known as the Imports Provision, plaintiffs brought this action on March 21, 2018 in the United States Court of International Trade. Plaintiffs sought an injunction requiring the Government to ban the import of fish or fish products from any Mexican commercial fishery that uses gillnets within the vaquita's range. Orig. Compl., ECF No. 1; Summ., ECF No. 2; Compl. at 19.

---

[1] Subsequent references to sections of federal statutes are to the relevant portions of the official 2012 edition of the United States Code.

In NRDC I, the Court explained that the vaquita's range is approximately 4,000 square kilometers in size, and overlaps with commercial fisheries that target shrimp, curvina, chano, and sierra, and with an illegal fishery targeting the endangered totoaba. NRDC I at 9–10. The Court noted that gillnet fishing for curvina and sierra remains legal, while fishing for shrimp and chano with gillnets inside the vaquita's range is illegal, but continues anyway. Id. at 6–7. Curvina, chano, and sierra fishing occurs year-round in the northern Gulf of California, while shrimp fishing occurs from September to March. Id. at 9–10. Plaintiffs and the Government agree that, though the vaquita is not a target of Mexican fishermen, it is threatened and inadvertently killed by gillnets deployed to capture these other species with which it shares its territory. The parties also agree that the vaquita is on the verge of extinction as a result.

After consideration of the parties' filings and all the appropriate factors, the Court denied the Government's motion to dismiss and, as noted, granted "plaintiffs' motion for a preliminary injunction requiring the Government, pending final adjudication of the merits, to ban the importation of all fish and fish products from Mexican commercial fisheries that use gillnets within the vaquita's range." On August 3, 2018, the Government moved to clarify the Court's Order, "in particular the specific species covered by the injunction." Def.'s Mot. to Clarify ("Def.'s Br.") at 1, ECF No. 34. Plaintiffs responded to the Government's motion on August 6, 2018. Pl.'s Resp. to Def.'s Mot., ECF No. 36.[2] The parties participated in a teleconference with the Court on August 7, 2018.

In the "Motion to Clarify," now before this Court, the Government asserts that the Court's Order is unclear as to the fisheries that are covered under the importation ban and as to the effective

---

[2] The Court commends the excellent briefing and argument, under urgent deadlines, by all counsel for the parties in these proceedings.

start date of the ban because: the MMPA does not generally apply to illegal commercial fisheries and therefore that Northern Gulf of California shrimp and chano commercial gillnet fisheries are excluded from the scope of the preliminary injunction; other federal statutes, namely the Lacey Act and the Magnuson-Stevens Fishers Conservation and Management Act ("Magnuson-Stevens Act") render inoperative the express duty imposed by the MMPA; and the purported regulatory challenges of implementation make immediate implementation impossible.  The Court rules that there should be no doubt that:  (1) the ban on the importation of commercial fish mandated by the MMPA is not limited to legal fisheries, but applies to illegal fisheries as well; (2) as is clear from the Court's opinion in NRDC I, the Government is enjoined and ordered to ban the importation from Mexico of all shrimp, curvina, sierra, and chano fish and their products caught with gillnets inside the vaquita's range; (3) other laws may also restrict the import of some of the fish covered by the ban does not bar from the Court from preliminarily enjoining the Government to ban importation under the MMPA; and (4) the import ban ordered by the Court pursuant to the MMPA is effective immediately.[3]

The Court addresses the Government's contentions in turn.

## DISCUSSION

I.      **The MMPA Imports Provision Applies to Legal and Illegal Fisheries.**

Submitting that "[e]nforcement of prohibitions against illegal fishing activities is not generally governed by the MMPA," the Government essentially questions whether the Court's

---

[3] Observing that the Government in its "Motion to Clarify" is raising arguments not previously made, plaintiffs argue that the motion is properly construed as a motion to narrow a preliminary injunction pursuant to CIT Rule 59(e) (mirroring Fed. R. Civ. Pro. R. 59(e)), and thus "not a vehicle to present a new legal theory that was available" before.  Leidos, Inc. v. Hellenic Republic, 881 F.3d 213, 217 (D.C. Cir. 2018) (internal quotation marks and citation omitted).  The Court need not resolve this claim as it determines that under any standard, the Government's contentions lack merit.

Order is meant to ban imports of shrimp and chano -- species for whom gillnet harvesting is already

illegal in Mexico -- and suggests that "[t]here may be other fish species harvested illegally with

gillnets within the vaquita's range that were not addressed at all in plaintiffs' motion." Def.'s Br.

at 2–3.

    The ban on the importation of commercial fish mandated by the Imports Provision, 16

U.S.C. § 1371(a)(2), is not limited to legal fisheries, but applies to illegal fisheries as well.  The

Court explained in NRDC I that the embargo Order applies to the curvina, sierra, shrimp, and

chano fisheries.  See NRDC I at 9 (listing the commercial fisheries that target "shrimp, curvina,

chano, and sierra" as overlapping with the vaquita's range); 9–10 (noting fishing seasons of

"[c]urvina, chano, [] sierra [and] shrimp"); 12–13 (discussing "curvina and sierra" and "shrimp

and chano" gillnet fishing within the vaquita's habitat); 28 (referring to "curvina, sierra, shrimp,

and chano" as the "gillnet fisheries in question"); 40 (listing "shrimp, sierra, and chano fisheries"

and "fourth fishery . . . curvina").  The Court noted that gillnet fishing for sierra and curvina is

legal, and that "[p]ursuant to the permanent ban on gillnet fishing of species other than the curvina

and sierra, fishing for shrimp and chano with gillnets inside the vaquita's range is illegal, but

continues anyway."  Id. at 12–13.

    As has been noted, the Imports Provision requires the Government to "ban the importation

of commercial fish or fish products which have been caught with commercial fishing technology

which results in the incidental kill . . . of ocean mammals in excess of United States standards."

16 U.S.C. § 1371(a)(2).  Nothing in the statute's language limits the Imports Provision ban to

"legal" fisheries, and the statute does not define the term "commercial fish," let alone define the

phrase in a way that excludes unlawfully caught fish.

Case 1:18-cv-00055-GSK   Document 39   Filed 08/14/18   Page 7 of 15

Court No. 18-00055                                                                 Page 7

The Government acknowledges that the MMPA requires the Secretary of the Treasury to "ban the importation of commercial fish or products from fish which have been caught with commercial fishing technology which results in the incidental kill or incidental serious injury of ocean mammals in excess of United States standards," 16 U.S.C. § 1371(a)(2), and asserts that neither "commercial" nor "incidental" are defined in the statute. Def.'s Br. at 3. The Government submits that these terms are defined under 50 C.F.R. § 216.3. Id. That provision defines "incidental catch" as the "taking of a marine mammal" in connection with "commercial fishing operations," and "commercial fishing operation" as "the lawful harvesting of fish from the marine environment for profit as part of an ongoing business enterprise." 50 C.F.R. § 216.3.

The Government's suggestion that the Imports Provision should be modified by the part 216 regulatory definitions is unpersuasive. By the regulation's own terms, those definitions only apply to the part 216 regulations themselves. See 50 C.F.R. § 216.3 (stating that general definitions apply "in this part 216"). To the extent that a regulatory definition of the term "commercial fishing operation" could inform the plain meaning of the statutory ban under the Imports Provision that this Court is enforcing, NOAA Fisheries has promulgated a separate, more specific definition of that term under its implementing regulations, which does not implicate the legality of imports under the moratorium. See 50 C.F.R. 216.24(h)(3)(i)(A). Under that definition, which applies "[f]or the purposes of paragraph (h) of this section, commercial fishing operation means vessels or entities that catch, take, or harvest fish . . . from the marine environment . . . that results in the sale or barter of all or part of the fish caught, taken or harvested."[4] Id. Even so, the Court notes,

---

[4] Moreover, NOAA Fisheries itself acknowledged that the Imports Provision applies to illegal commercial fisheries when it included gillnet caught shrimp from the northern Gulf of California as an "export" fishery on its 2018 List of Foreign Fisheries. Pl.'s Br. Ex. 3, at 122, ECF No. 14-1. As noted, gillnet fishing for shrimp has been illegal in Mexico's Gulf of California at least since April 16, 2015, and well before the 2018 List of Foreign Fisheries was published. See O'Connell

as it did in its previous opinion, that "[t]he prohibitions of [50 C.F.R. § 216.24(h)(1)]," which

provide for a comparability finding regime under the implementing regulations, "do not apply

during the exemption period," which is "the one-time, five-year period that commences January

1, 2017." Id. §§ 216.24(h)(2)(ii), 216.3; see NRDC I at 9, 20, 36–37.

     Altogether, the Imports Provision ban applies to legal and illegal fisheries whose "fish or

fish products [] have been caught with commercial fishing technology which results in the

incidental kill . . . of ocean mammals in excess of United States standards." 16 U.S.C. § 1371(a)(2).

**II.**    **The Lacey Act and Magnuson-Stevens Act Do Not Render the MMPA Inoperative.**

     The Government also argues that the preliminary injunction cannot include imports of

shrimp and chano caught in gillnets contrary to Mexican law because the Lacey Act and the

Magnuson-Stevens Act statutorily ban fish harvested in violation of foreign law and impose

steeper penalties than the MMPA. Def.'s Mot. at 2. The Lacey Act prohibits the import of "any

fish or wildlife taken . . . in violation of foreign law," 16 U.S.C. § 3372(a)(2)(A), and provides for

potential criminal penalties against violators, id. § 3373(d). The Magnuson-Stevens Act imposes

greater maximum civil penalties that the MMPA. Compare 16 U.S.C. § 1858(a) (providing for

civil penalties of up to $100,000 for each violation) with 16 U.S.C. § 1375 (providing up to $20,000

in civil penalties for each knowing violation of the MMPA).

---

Decl. ¶¶ 15–16, Apr. 11, 2018, ECF No. 14-5. The fisheries on the List of Foreign Fisheries are identified as either "exempt," because they have a "remote likelihood of, or no known" marine mammal bycatch, or "export," defined as a "foreign commercial fishing operation determined by the Assistant Administrator to be the source of exports of commercial fish and fish products to the United States and to have more than a remote likelihood of incidental mortality and serious injury of marine mammals . . . in the course of its commercial fishing operations." 50 C.F.R. § 216.3. Any "[c]ommercial fishing operations not specifically identified in the current List of Foreign Fisheries as either exempt or export fisheries are deemed to be export fisheries . . . ." Id.

The Government's argument is unavailing.  Federal statutes can and do have complementary and overlapping objectives, and the existence of one source of enforcement authority does not render other statutory authorities inoperative.  See Alfa Int'l Seafood v. Ross, 264 F. Supp. 3d 23, 31, 48, 52 (D.D.C. 2017) (finding that neither the Food and Drug Administration nor the Lacey Act had sole authority for promulgating regulations on seafood labelling); Wash. Toxics Coal. v. EPA, 413 F.3d 1024, 1031–32 (9th Cir. 2005) (holding that compliance with the registration requirements of the Federal Insecticide, Fungicide, and Rodenticide Act ("FIFRA") did not relieve the agency of its Endangered Species Act obligations even though FIFRA included an endangered species provision).

The three acts in question here -- the Lacey Act, the Magnuson-Stevens Act, and the MMPA -- serve complementary, non-duplicative functions as part of a wider framework of wildlife protection legislation.  See Lacey Act Amendments of 1981, S. Rep. 97-123, at 2, reprinted in 1981 U.S.C.C.A.N. 1748, 1749 ("[W]ildlife trade is subject to the customs law, the Lacey [Act] and a number of other federal wildlife laws such as the Endangered Species Act, the Marine Mammal Protection Acts [sic], and the Migratory Bird Treaty Act.").  The Lacey Act bars trafficking in illegal wildlife, 16 U.S.C. § 3372(a), and managing invasive species potentially harmful to people, agriculture, or wildlife in the U.S., 18 U.S.C. § 42(a)(1), while the Magnuson-Stevens Act addresses fish stock management and fish, 16 U.S.C. § 1801(a)(6).  In contrast, the MMPA is concerned with marine mammals, id. § 1361(6), many of which -- including the vaquita -- are not a trafficked animal under the Lacey Act or a fish regulated by the Magnuson-Stevens Act.

Moreover, neither the Lacey Act, id. § 3372(a)(1), or Magnuson-Stevens Act, id. § 1857(1)(G), provides that either statute is the exclusive source of federal authority for regulating

fish imports, as the Government implicitly acknowledges by citing both statutes.  The Magnuson-Stevens Act does not address its interaction with other federal statutes.  See id. § 1856 (discussing the interaction of federal and state law only).  The Lacey Act states that "[n]othing in this chapter shall be construed as . . . repealing, superseding, or modifying any provision of Federal law other than those specified in subsection (b)," id. § 3378(c)(1), which does not include the MMPA, id. § 3378(b).  Moreover, as mentioned previously, the Lacey Act was intended to function as one part of a framework of wildlife protection statutes.  See Lacey Act Amendments of 1981, S. Rep. 97-123, at 2, reprinted in 1981 U.S.C.C.A.N. 1748, 1749.  Thus, neither the Lacey Act nor Magnuson-Stevens Act provides the exclusive source of federal authority for regulating fish imports -- as the Government implicitly acknowledges by citing them both -- and does not excuse the Government from its MMPA obligations or prevent the issuance of a preliminary injunction requiring the Government to ban imports as mandated by the MMPA.

**III.     The Court's Order Preliminarily Enjoining the Government Is Effective Immediately.**

In its motion, citing "certain implementation challenges," the Government appears to question whether the importation ban imposed by the Court is effective immediately.  It states that the regulatory process that it is pursuing diligently to "create a certificate of admissibility that exporters and importers of products of the United States Harmonized Tariff Schedule categories covering the species included in the ban" -- which, the Court repeats, are shrimp, curvina, chano, and sierra -- "would be required to provide to certify that their fish imports were not harvested with gillnets within the vaquita's range." Def.'s Br. at 4–5.  The Government contends that these steps are required under 50 C.F.R. § 216.24(h)(9) to effectuate the Court's Order.  Id.  The Government also notes, and reiterated during teleconference with the Court, that this process involves multiple administrative entities and is of indeterminate length.  Id.

The Court discerns no merit in the Government's suggestion that the import ban is not effective immediately. The Court reiterates that it is effective immediately. The Government's position is inconsistent with the moratorium imposed by the Imports Provision of the MMPA. 16 U.S.C. § 1371(a)(2). The Court has explained that the text of the Imports Provision imposes on the Government an immediate and continuous duty to ban fish caught with fishing gear that kills marine mammals, such as the vaquita, in excess of United States standards. NRDC I at 22–23, 35. By the terms of the statute, it is the immediate goal that bycatch be "reduced to insignificant levels approaching a zero mortality and serious injury rate." 16 U.S.C. §1371(a)(2). The Court's Order enjoins the Government pursuant to the statutory Imports Provision of the MMPA and not pursuant to the implementing regulations, which do not become effective until January 1, 2022. The regulatory procedures governing certification of admissibility, see 50 C.F.R. § 216.24(h)(1)(ii)(B), (9), impose the import prohibitions encapsulated in § 216.24(h)(1). As the Court discussed in NRDC I, as mentioned supra, "[t]he prohibitions of [50 C.F.R. § 216.24(h)(1)]," which provides for a comparability finding regime under the implementing regulations, "do not apply during the exemption period," which is "the one-time, five-year period that commences January 1, 2017." Id. §§ 216.24(h)(2)(ii), 216.3; see NRDC I at 9, 20, 36–37.

In short, the Court's Order enjoining the Government to ban imports from the four specified fisheries -- shrimp, curvina, chano, and sierra -- that use gillnets in the vaquita's range is effective immediately as to all such imports, unless affirmatively identified as having been caught with a gear type other than gillnets or affirmatively identified as having been caught outside the vaquita's range. Pursuant to CIT Rule 65(d), the Court on this date issues an updated Order, also set forth below in the Appendix to this Opinion.

**SO ORDERED.**

/s/     *Gary S. Katzmann*
Gary S. Katzmann, Judge

Dated: _____
New York, New York


# APPENDIX A

### UNITED STATES COURT OF INTERNATIONAL TRADE

BEFORE: THE HONORABLE GARY S. KATZMANN, JUDGE

| | |
|---|---|
| NATURAL RESOURCES DEFENSE COUNCIL, INC., CENTER FOR BIOLOGICAL DIVERSITY, and ANIMAL WELFARE INSTITUTE, <br><br> Plaintiffs, <br><br> v. <br><br> WILBUR ROSS, *in his official capacity as Secretary of Commerce*, UNITED STATES DEPARTMENT OF COMMERCE, CHRIS OLIVER, *in his official capacity as Assistant Administrator of the National Marine Fisheries Service*, NATIONAL MARINE FISHERIES SERVICE, STEVEN MNUCHIN, *in his official capacity as Secretary of the Treasury*, UNITED STATES DEPARTMENT OF THE TREASURY, KIRSTJEN NIELSEN, *in her official capacity as Secretary of Homeland Security*, and UNITED STATES DEPARTMENT OF HOMELAND SECURITY, <br><br> Defendants. | Court No. 18-00055 <br><br> **Further Order on Plaintiffs' Motion for Preliminary Injunction** |

Plaintiffs brought this case on March 21, 2018. ECF No. 1. On April 16, 2018, plaintiffs filed a motion for a preliminary injunction. ECF No. 14. The Government moved to dismiss this case on May 7, 2018. ECF No. 15. On July 10, 2018, oral argument was held before the Court on

both motions. On July 26, 2018, the Court granted Plaintiffs' Motion for Preliminary Injunction "requiring the Government, pending final adjudication of the merits, to ban the importation of all fish and fish products from Mexican commercial fisheries that use gillnets within the vaquita's range." The Court also denied Defendants' Motion to Dismiss. ECF No. 30. On July 31, 2018, plaintiffs paid the ordered security into the registry of the Court. On August 7, 2018, the parties participated in a teleconference with the Court. Pursuant to CIT Rule 65(d), the Court issues this Order:

**(A)     Reasons a preliminary injunction is warranted**

### Findings of Fact

The cause of the vaquita's precipitous decline is its inadvertent tangling, strangulation, and drowning in gillnets, and with only about 15 vaquita remaining, the status of the species is so precarious that even one mortality could increase the likelihood of extinction. The vaquita's range overlaps with commercial gillnet fisheries that target shrimp, curvina, chano, and sierra, and each of these fisheries poses a risk of entanglement. Fishing for curvina and sierra with gillnets inside the vaquita's range is legal, and fishing for shrimp and chano with gillnets inside the vaquita's range is illegal but continues anyway. Plaintiffs have provided persuasive evidence demonstrating that the United States is a significant export market for the curvina, sierra, shrimp, and chano gillnet fisheries in question.

### Conclusions of Law

Plaintiffs have demonstrated a fair likelihood of success on the merits of their claim, that they are likely to suffer irreparable harm without a preliminary injunction, that the balance of equities favors an injunction, and that a preliminary injunction is in the public interest. Section 101(a)(2) of the MMPA, 16 U.S.C. § 1371(a)(2), also known as the Imports Provision, imposes

on the Government an immediate and continuous duty to ban fish caught with fishing gear that

kills marine mammals, such as the vaquita, in excess of United States standards. That statute

provides that "it shall be the immediate goal that the incidental kill or incidental serious injury of

marine mammals permitted in the course of commercial fishing operations be reduced to

insignificant levels approaching a zero mortality and serious injury rate." Plaintiffs have

established a fair likelihood that potential biological removal level, also known as PBR, is a

marker of "United States standards" and that vaquita are being incidentally killed by gillnets in

the northern Gulf fisheries in excess of their PBR. The likely, imminent extinction of the vaquita

in the absence of statutorily mandated action constitutes irreparable harm, and a preliminary

injunction would effectuate the MMPA's purpose of preserving marine mammal populations—in

this case, the vaquita—which the Government acknowledges is on the verge of extinction.

**(B)      The terms of the preliminary injunction & acts required**

It is **ORDERED** that Plaintiffs' Motion for Preliminary Injunction (ECF No. 14) is

**GRANTED**. Defendants, their agents and their employees, and those in active concert and

participation with them are enjoined and hereby **ORDERED** to immediately ban the importation

from Mexico of all shrimp, curvina, sierra, and chano fish and their products caught with gillnets

inside the vaquita's range.

It is further **ORDERED** that this ban shall include all shrimp, curvina, sierra, and chano

and their products sourced from the Gulf of California, Mexico, unless affirmatively identified

as having been caught with a gear type other than gillnets or affirmatively identified as caught

outside the vaquita's range.

It is further **ORDERED** that Defendants shall within the next 15 days submit for

publication in the Federal Register notice of the ban on shrimp, curvina, sierra, and chano and

their products from Mexico caught with gillnets within the vaquita's range.

It is further **ORDERED** that Defendants will file a status report with the Court within 30 days documenting compliance with this order, and every 30 days thereafter until the preliminary injunction is fully implemented.

It is further **ORDERED** that this order shall be effective immediately and continue until further order of the Court.


Dated:   August 14, 2018
         New York, New York


                                              /s/    *Gary S. Katzmann*
                                        _____
                                              Gary S. Katzmann, Judge